## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN J. GIANTONIO, on behalf of the Chicago Bridge & Iron Savings Plan, The Shaw Group Inc. 401(k) Plan, himself, and a class consisting of similarly situated participants of the Plans, <br><br> Plaintiff, <br><br> v. <br><br> CHICAGO BRIDGE & IRON COMPANY, INVESTMENT COMMITTEE, PLAN ADMINISTRATOR, STEPHEN H. DIMLICH, JR., WESTLEY S. STOCKTON, SHEILA FELDMAN, JOHN DOES 1-20, and RICHARD ROES 1-20, <br><br> Defendants. | Case No. 1:17-cv-04251 <br><br><br> **CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

### NATURE OF THE ACTION

1.      Plaintiff John J. Giantonio ("Plaintiff"), on behalf of the Chicago Bridge & Iron Savings Plan (the "Plan"),[1] individually, and as representative of the class described herein, brings this action against the herein named defendants (collectively "Defendants") pursuant to §§ 404, 405, 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1109 and 1132.[2]

---

[1] Effective January 1, 2016, the Plan was amended and restated to merge the Plan with The Shaw Group Inc. 401(k) Plan (the "Shaw Plan" and together with the Shaw Plan the "Plans"). This action is also brought derivatively on behalf of the Shaw Plan and its assets.

[2] All allegations contained herein are based upon personal information as to Plaintiff and the investigation of Plaintiff's counsel. In particular, Plaintiff, through his counsel, has reviewed, among other things, documents filed with the United States Department of Labor (the "DOL") and the United States Securities and Exchange Commission (the "SEC"), other lawsuits against Chicago Bridge & Iron Company N.V. ("CB&I" or the "Company"), public statements and

2.     This case is about the failure of the Defendants, fiduciaries of the Plans, to protect the interests of the Plans' Participants in violation of the Defendants' legal obligations under ERISA.  Defendants breached the duties they owed to the Plans, to Plaintiff, and to the putative class members who are also Participants, by, *inter alia*, retaining common stock of CB&I ("CB&I Stock" or "Company Stock") as an investment option in the Plans and allowing the Plans to continue to purchase Company Stock when a reasonable fiduciary using the "care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use" would have done otherwise.  *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

3.     The Defendants permitted the Plans to continue to offer CB&I Stock as an investment option to Participants even after the Defendants knew or should have known that CB&I Stock was artificially inflated during the Class Period (October 29, 2013, through the present), as alleged in further detail below, making it an imprudent retirement investment for the Plans given their purpose of helping Participants save for retirement.  Defendants knew or should have known that material facts about CB&I's business had not been disclosed to the market, causing CB&I Stock to trade at prices above which it would have traded had such facts been disclosed.  Defendants were empowered as fiduciaries to remove CB&I Stock from the Plans' investment options or to take other measures to help Participants, yet they failed to do so or to act in any way to protect the interests of the Plans or their Participants, in violation of Defendants' legal obligations under ERISA.

4.     In *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), the Supreme Court confirmed that plan fiduciaries violate ERISA when they continue to offer an imprudent plan investment option.  In *Fifth Third,* the Court considered a class action case similar to this

media reports, and also had discussions with participants and beneficiaries (the "Participants") of the Plans.

one in which plan participants challenged the plan fiduciaries' failure to remove company stock as a plan investment option. The Supreme Court confirmed that ERISA fiduciaries are required to independently determine whether company stock remains a prudent investment option. In that case, the defendant-fiduciaries argued that their decision to buy or hold company stock was entitled to a fiduciary-friendly "presumption of prudence" standard. *Fifth Third*, 134 S. Ct. at 2463. The Supreme Court rejected that argument, holding that "no such presumption applies," *id.,* and further held "that the duty of prudence ***trumps*** the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary." *Id.* at 2468 (citation omitted) (emphasis added). Accordingly, the Plans' "fiduciaries are subject to the same duty of prudence that applies to ERISA fiduciaries in general." *Id*. at 2463. Thus, even if the Plans purportedly required that CB&I Stock be offered, the Plans' fiduciaries were obligated to disregard that directive once Company Stock was no longer a prudent investment for the Plans.

5.    The thrust of Plaintiff's allegations under Counts I (breach of the duty of prudence) and II (breach of the duty of loyalty) is that Defendants allowed the investment of the Plans' assets in CB&I Stock throughout the Class Period despite the fact that Defendants knew or should have known that that investment was imprudent as a retirement vehicle for the Plans.

6.    CB&I Stock was artificially inflated during the Class Period and the Plans wasted assets by purchasing artificially inflated CB&I Stock. During the Class Period, the Company failed to disclose that it was responsible for hundreds of millions of dollars in liability and had improperly accounted for its goodwill during 2013 to cover losses associated with construction delays and cost overruns on contracts to complete construction of new nuclear power plants in Waynesboro, Georgia and Jenkinsville, South Carolina (the "Nuclear Projects"). Furthermore,

the Company faces potential fraud claims valued at over $2 billion, which exceeds its market capitalization as of the filing of this Complaint.

7.    Given the totality of circumstances prevailing during the Class Period, no prudent fiduciary could have made the same decision as made by Defendants here to retain and/or continue purchasing the clearly imprudent CB&I Stock as investment in the Plans.  To remedy the breaches of fiduciary duties as described herein, Plaintiff seeks to recover the financial losses suffered by the Plans as a result of the diminution in value of Company Stock invested in the Plans during the Class Period, and to restore to the Plans what Participants would have received if the Plans' assets had been invested prudently.

## JURISDICTION AND VENUE

8.    ***Subject Matter Jurisdiction.***  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9.    ***Personal Jurisdiction.***  This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

10.    ***Venue.***  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans are administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and a related securities action (*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Chicago Bridge & Iron Company N.V., et al.*, No. 17-cv-01580) is pending in this District.

## PARTIES

**Plaintiff**

11.     Plaintiff John J. Giantonio was a CB&I employee and is a Participant in the Plans, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).   Plaintiff suffered losses in his individual Plan account as a result of investing in CB&I Stock during the Class Period.

**Defendants**

      (a)     **Company Defendant**

12.     Defendant CB&I provides a range of services to customers in the energy infrastructure market across the world. The Company provides various services, such as conceptual design, technology, engineering, procurement, fabrication, modularization, construction, commissioning, maintenance, program management and environmental services. It operates through four segments. Its Engineering and Construction segment provides engineering, procurement, and construction ("EPC") services. Its Fabrication Services segment provides fabrication and erection of steel plate structures; fabrication of piping systems and process modules, and manufacturing and distribution of pipe and fittings. Its Technology segment provides licensed process technologies and catalysts for use in petrochemical facilities and oil refineries. Its Capital Services operating group provides environmental engineering and remediation, infrastructure EPC services and program management.

13.     At all times relevant to this Complaint, the Company managed and administered the Plans and the assets of the Plans and acted as a fiduciary with respect to the Plans, or appointed a committee to do so.  According to Section 9.01 of the Plan's governing document, as amended and restated as of January 1, 2014 (the "Plan Document"),[3] "[t]he Company shall have

---

[3] The Plan document was filed as Exhibit 10.13 to a Form 10-K filed by CB&I on February 27, 2014.

overall responsibility for the administration and operation of the Plan, which the Company shall discharge by the appointment and removal (with or without cause) of the Trustee, the Investment Committee and the Plan Administrator."

14.     At all relevant times, the Company was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

15.     The Company maintains in office in this District at 1251 Avenue of the Americas, Suite 750, New York, New York 10020.

**(b)    The Committee and Plan Administrator Defendants**

16.     Defendant Investment Committee (the "Committee") is a fiduciary of the Plans pursuant to the Plan Document, which states in relevant part that:

> 6.06 **Investment Committee**. The Company shall appoint an Investment Committee composed of one (1) or more persons who are officers, directors or employees of the Company or a Related Company to select Investment Funds, to appoint and remove any Investment Manager, to engage consultants, to formulate an investment policy, to monitor the performance of Investment Funds and Investment Managers, and to perform such other functions with respect to the investment of the assets of the Plan as the Company may direct. Each member of the Committee shall serve until death, resignation, removal, or until he or she ceases to be an officer, director or employee of any of the Company and any Related Company. Any member of the Committee may resign upon fifteen (15) days written notice to the Company. The Company may remove any member of the Committee upon fifteen (15) days written notice to such member and all other members of the Committee. If a vacancy occurs in the membership of the Committee the Company may (and if there would otherwise be no members of the Committee, shall) appoint a successor member of the Committee who shall have the same powers and duties as those conferred upon his or her predecessor(s). The Company shall advise the Trustee, any Investment Manager and the Plan Administrator of the membership of the Committee and of any

change therein; and the Trustee, any Investment Manager and the Plan Administrator shall be protected in reliance on any such notice. The Committee shall act at a meeting, or in writing without a meeting, by the vote or concurrence of a majority of its members; provided, however, that no member of the Committee who is a Participant shall take part in any action having particular reference to his or her own benefits hereunder. All written directions by the Committee may be made over the signatures of a majority or its members and all persons shall be protected in relying on such written directions.

6.07 **Investment Funds**. The assets of the Trust Fund shall be invested in the Investment Funds authorized by the Investment Committee for the investment of Participants' Accounts. The Investment Committee may, from time to time, authorize additional Investment Funds with such investment characteristics, as it deems appropriate. The Investment Committee may also terminate the use of any Investment Fund by this Plan as it deems appropriate. The Trustee, Investment Manager, or the manager of any Investment Fund, may modify the investment characteristics of any Investment Fund as it deems appropriate. The designation, modification or termination of any Investment Fund shall be reflected in the records of the Plan and shall be communicated promptly to the Plan Administrator. Subject to the provisions of Section 6.08, up to one hundred percent (100%) of a Participant's Accounts may be invested in the Company Stock Fund.

In order to maintain appropriate or adequate liquidity and pending or pursuant to investment directions, the Trustee, Investment Manager or the manager of any Investment Fund is authorized to hold such portions of each of the Investment Funds as it deems necessary in cash or liquid short-term cash equivalent investments or securities (including, but not limited to, United States government treasury bills, commercial paper, and savings accounts and certificates of deposit, and common or commingled trust funds invested in such securities).

17.    Defendant Plan Administrator (the "Plan Administrator") is the administrator for

the Plans pursuant to the Plan Document, which states in relevant part that:

9.02 **Plan Administrator Rights and Duties**. The Plan Administrator shall administer and enforce the Plan and the Trust in accordance with the terms of the Plan and the Trust Agreement and shall have all powers necessary to accomplish that purpose, including but not by way of limitation, the following, all to be

exercised in the sole and absolute discretion of the Plan Administrator:

(a) To issue rules, regulations and procedures and prescribe forms necessary for the proper conduct and administration of the Plan and to change, alter, or amend such rules, regulations and procedures and forms;

\* \* \*

(f) To employ and compensate such accountants and attorneys (who may but need not be the accountants or attorneys of the Company) and other persons to render advice, and such clerical employees as the Plan Administrator may deem necessary to the performance of his, her or its duties;

\* \* \*

(m) To do all other acts and things necessary he, she or it deems in his, her or its sole discretion to be necessary or appropriate for the administration of the Plan.

18.    Defendant Stephen H. Dimlich, Jr., CB&I's Senior Vice President, Corporate Human Resources, signed a Form 11-K Annual Report filed by the Plan with the SEC on June 27, 2014 (the "2014 11-K"), and a Form 11-K Annual Report filed by the Plan with the SEC on June 26, 2015 (the "2015 11-K") on behalf of the Plan Administrator.

19.    Defendant Westley S. Stockton, CB&I's Vice President, Corporate Controller and Chief Accounting Officer, signed the 2014 11-K, the 2015 11-K, and a Form 11-K Annual Report filed by the Plans with the SEC on June 23, 2016 (the "2016 11-K") on behalf of the Plan Administrator.

20.    Defendant Sheila Feldman, CB&I's Executive Vice President, Chief Human Resources Officer, signed the 2016 11-K on behalf of the Plan Administrator.

21.    John Does 1-20, without limitation, are the unknown Plan Administrators, members of the Committee, or any other committee(s) which administered the Plans, and all members thereof.  The identities of the committee(s) and the members of the committee(s) which

were responsible for carrying out the provisions of the Plans are currently not known. John Does 1-20 are fiduciaries of the Plans and are believed to be employees of the Company.

22.     The Defendants named in ¶¶ 16-21 herein are referred to herein as the "Committee and Administrator Defendants."

23.     At all relevant times, the Committee and Administrator Defendants and the John Doe defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

**(c)     The Monitoring Defendants**

24.     Defendants Richard Roes 1-20 (together with the Company the "Monitoring Defendants") were persons who had the duty and responsibility to properly appoint, monitor and inform the Committee and Administrator Defendants and John Doe Defendants (as defined herein) and/or other persons who exercised day-to-day responsibility for the management and administration of the Plans and their assets. The Monitoring Defendants failed to properly appoint, monitor and inform such persons in that the Monitoring Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the Monitoring Defendants did adequately inform such persons of the true financial and operating condition of the Company (including construction delays and cost overruns on contracts to complete construction of the Nuclear Projects during the Class Period identified herein) but nonetheless continued to allow such persons to offer CB&I Stock as an investment option under the Plans when the market price of CB&I Stock was artificially inflated and CB&I Stock was an imprudent investment for Participants' retirement accounts under the Plans.

Liability is only asserted against each of the Monitoring Defendants for such periods of time as the Monitoring Defendants acted as a fiduciary with respect to the Plans.

25.     At all relevant times, the Richard Roe defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

### (d)     Additional "John Doe Defendants"

26.     To the extent there are additional officers and employees of CB&I who were fiduciaries of the Plans during the Class Period, or any other committees or members of such committees that were fiduciaries of the Plans in connection with the allegations herein, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 1-10 include, in addition to the above, other individuals, including, but not limited to, CB&I officers and employees who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

### THE PLANS

27.     Both Plans are defined contribution retirement plans within the meaning of ERISA.  The Plans are intended to be retirement plans.

28.     According to the 2016 11-K:

> *General*—The Plan is a defined contribution plan in which certain employees of Chicago Bridge & Iron Company ("CB&I") and certain related companies (collectively, the "Company") are eligible to participate immediately upon hire. On February 13, 2013, CB&I acquired The Shaw Group Inc. ("Shaw"); however, individuals employed by the acquired Shaw entities were not eligible to participate in the Plan through December 31, 2015.

The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). T. Rowe Price Trust Company (the "Trustee") and T. Rowe Price Retirement Plan Services, Inc. served as trustee and record keeper, respectively, for the Plan through December 31, 2015. As more fully described in Note 9, effective January 1, 2016, Bank of America N.A. ("BofA") and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S") became the trustee and record keeper of the Plan, respectively.

*Participant and Company Contributions*—Contributions to the Plan are comprised of employee 401(k) voluntary pre-tax salary deferrals, employee voluntary after-tax Roth contributions, Company 401(k) safe harbor matching contributions and annual Company contributions. Company contributions are discretionary and participant eligibility can be constrained by union agreement, Company subsidiary or service.

> •*Participant Contributions*—Participants may contribute amounts on a pre-tax deferred basis or an after-tax Roth basis up to a maximum of 75% of eligible compensation subject to the lower of dollar limits set by the Internal Revenue Service (the "IRS") or percentage limits set by the Company in advance of a given Plan year. Participants may elect to change their contribution percentages at any time.

> •*Company Matching Contributions*—The Company contributes safe harbor matching contributions totaling 100% of the first 3% and 50% of the next 2% of employee voluntary contributions. New employees must complete one year of service to be eligible to participate in the Plan with respect to Matching Contributions.

> • *Annual Company Contributions*—The Company may elect, at its sole discretion, to make a Company Contribution for eligible participants (as defined below) each Plan year. To be eligible to receive a Company Contribution, a participant must: (i) be employed with the Company as of the last day of the Plan year, and (ii) must complete one year of service. The amount of the Company Contribution is determined as a uniform percentage of compensation and is allocated to each eligible participant following the end of the Plan year for which the contribution was made. For 2015 and 2014, the Company elected not to make a Company Contribution.

*Participant Accounts*—Individual accounts are maintained for each Plan participant. Participant and Company contributions are

allocated to investments within each participant account based upon participant-directed percentages. Investment earnings of funds are allocated to participant accounts based upon the participant's relative percentage ownership of the total applicable fund. The benefit to which a participant is entitled is the benefit that can be provided from the vested portion of a participant's account (see "Vesting" section below).

*Investment Options*—Participants may direct the investment of their account balances into any or all of a number of investment options offered by the Plan, which include: (i) mutual funds investing in equities and bonds, including certain mutual funds beyond the Trustee's family of funds, (ii) a stock fund, which invests in the common stock of Chicago Bridge & Iron Company N.V. ("CB&I N.V."), CB&I's parent [the "Company Stock Fund"], and (iii) common collective trust funds. Participants may transfer account balances among investment options; however, transfers cannot cause the Participant's account balance held in the CB&I N.V. stock fund to exceed 20% of the Participant's entire account balance.

*Vesting*—Participant contributions and all earnings on those contributions vest immediately. Company matching contributions made to the Plan prior to January 1, 2014, vest after three years of service with the Company. Company matching contributions made on or after January 1, 2014 vest immediately. If the Company elects to make an annual Company contribution, those contributions will vest after three years of service with the Company. Participants who reach age 65 or who terminate their participation in the Plan due to death, disability, retirement, or a reduction-in-force termination, are granted full vesting in Company matching and annual Company contributions.

29.    At year-end 2013, close to the start of the Class Period, the Plan held $57,473,328 in CB&I Stock, and at year-end 2015, the latest publicly available data, the Plan held $26,027,612 in CB&I Stock.

30.    The 2016 11-K discloses that: "Prior to January 1, 2014, interfund transfers to the CB&I N.V. stock fund from other investment options were not permissible under the Plan. Effective January 1, 2014, the Plan was amended and restated to allow Participants to transfer a portion their account balance into the CB&I N.V. stock fund. However, the transfer must not

cause the balance of the Participant's accounts held in the CB&I N.V. stock fund to exceed 20% of the Participant's entire account balance."

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action derivatively on the Plans' behalf pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plans, Plaintiff, and the following class of similarly situated persons (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plans at any time from October 29, 2013, through the present,[4] and whose Plans accounts included investments in Company Stock.

32.     Given ERISA's distinctive representative capacity and remedial provisions, courts have observed that ERISA litigation of this nature presents a paradigmatic example of a FED. R. CIV. P. 23(b)(1) class action.

33.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are at least thousands of members of the Class. For example, the Plan's 2015 Form 5500 Annual Return/Report of Employee Benefit Plan shows that there were 8,790 Participants at the start of 2015.

34.     At least one common question of law or fact exists as to Plaintiff and all members of the Class, which common question will resolve an issue that is central to the validity of each

---

[4] Plaintiff reserves its right to modify the Class Period definition in the event further investigation/discovery reveals a more appropriate time period during which CB&I Stock constituted an imprudent investment option for the Plan.

Class member's claims in one stroke.  Multiple such questions of law and fact common to the Class exist, including, but not limited to:

   (a)  whether Defendants each owed a fiduciary duty to the Plans, Plaintiff, and members of the Class;

   (b)  whether Defendants breached their fiduciary duties to the Plans, Plaintiff, and members of the Class by failing to act prudently and solely in the interests of the Plans and the Plans' participants and beneficiaries;

   (c)  whether Defendants violated ERISA; and

   (d)  whether the Plans, Plaintiff, and members of the Class have sustained damages and, if so, what is the proper measure of damages.

35.  Plaintiff's claims are typical of the claims of the members of the Class because the Plans, Plaintiff, and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of ERISA as complained of herein.

36.  Plaintiff will fairly and adequately protect the interests of the Plans and members of the Class because he has no interests antagonistic to or in conflict with those of the Plans or the Class.  In addition, Plaintiff has retained counsel competent and experienced in class action litigation, complex litigation, and ERISA litigation.

37.  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the action, or substantially impair or impede their ability to protect their interests.

38.     Class action status is also warranted under the other subsections of Rule 23(b)(1)(A) and (b)(2) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

### FACTS BEARING UPON DEFENDANTS' FIDUCIARY BREACHES

### BACKGROUND

39.     On July 30, 2012, *The Wall Street Journal* reported that CB&I would buy Shaw Group Inc. ("Shaw") for $3 billion.   *The Wall Street Journal* article quoted CB&I Chief Executive Officer ("CEO") Philip K. Asherman described the Shaw transaction as "as an attractive 'bolt on' acquisition that will give CB&I, which is more focused on the oil-and-gas-business, better access to lucrative and potentially growing projects in the electric-power industry[,]" including the Nuclear Projects.

40.     As *The Motley Fool* reported in a March 9, 2015 article entitled "The Chicago Bridge and Iron Merger with Shaw: A Marriage of Unequals"

> . . . despite all the talk of synergies, Shaw and CBI were worlds apart, as different as they come in the EPC (engineering, procurement, and construction) sector. CBI is one of the leading companies in that field. Shaw by contrast was a hodgepodge mix of substandard companies clobbered [sic] together by an ambitious management; to top it off, it was saddled by a portfolio of money-losing nuclear contracts.
>
> Not surprisingly, the market soon realized the wrongness of this marriage and halved the stock price back to where it stood before the vows were exchanged. Since Shaw is now half of CBI, to understand if CBI is a good investment today, we must dig deeper into Shaw.

**Who exactly is this Shaw, and how bad is she?**

Shaw began life in 1987 as a small but ambitious pipe fabricator. It only entered the EPC field in 2000 when it acquired the assets and unfortunately also the liabilities of the then-bankrupt Stone & Webster, once a leading name in the EPC sector.

With this acquisition, Shaw entered the big time. Its revenues grew to $1.5 billion in 2001, then broke $3 billion the following year. But beneath the spectacular growth, Shaw was struggling to adjust to the EPC business, and the contracts it inherited from Stone were no help at all.

The EPC business is unique in many ways, and to understand Shaw and CBI, we need at least a basic understanding of this rather obscure sector.

Contracts in this sector range from, on the one hand, the fixed-price contract, in which cost savings and cost overruns go to the contractor, to the cost-reimbursable contract, in which the contractor simply passes along the costs to the contractee and earns a pre-established margin. A lot of contracts are neither one nor the other, but somewhere in between; fixed-priced contracts can have a cost-reimbursable component and vice versa.

To survive in this field, one must be technologically competent, but above all, one must know how to manage risk. An EPC company is half fabricator/manufacturer, half insurance company. When it signs a fixed-price contract, for instance, the contractor is, in effect, selling the contractee insurance. In return for a higher contract price -- a sort of premium -- it accepts the risk of cost overruns, which can be quite staggering, as we will see.

Surviving in this sector is no easy task, and Shaw from the beginning was ill-equipped for the challenge. To cover its weaknesses, Shaw relied on its accounting skills, that is to say, on its ability to mask reality. Since CBI later would resort to similar measures, it behooves us to dig a little deeper into this unfortunate episode.

**The shenanigans of Shaw**

An acquisition gives the unscrupulous buyer a prime opportunity to obscure reality. One way to do this is to book a large liability, a reserve, under a name like "accrued contract losses" or "fair value reserve," and then gradually release that reserve over time as management sees fit.

Typically when a reserve is booked, it's done through the income statement -- the loss reserves of an insurance company, for instance, are created by an expense, usually the biggest expense, on its income statement. When a company is acquired, however, the liability is simply consolidated without ever being expensed, and then it's released over time as management sees fit.

Not only did Shaw book a reserve, it made good use of the one-year "measurement period" that is allowed under U.S. GAAP. In 2000, it started with a reserve of $119 million, of which it released $13.5 million that same year, bringing the reserve down to $106 million. In 2001 -- the sharpest cut of all -- it released $99 million in reserves and then simultaneously replenished them by $43 million. Because it was still within the measurement period, Shaw could add the $43 million to its reserves not by expensing through the income statement, but by adding to goodwill as a reevaluation of previous estimates.

But accounting magic could not hide the fact that Shaw had overextended itself. It was a mere pipe manufacturer, after all, which had acquired itself into the EPC business. It had no real experience running a major project, nor in managing risk on a grand scale.

In 2003, telltale signs of trouble appeared. Shaw released $42 million in reserves that year as a reduction to cost of revenues. Since it reported about $32.6 million of income before taxes, in reality it had lost about $9 million at best -- and not earned $20 million as it reported. Operating cash flow came in at a staggering minus $200 million. Not surprisingly, the stock fell from a high of $63 in 2001 to a low of $8.9 in 2003.

These conditions made it impossible for Shaw to pay off the debt it had incurred for its acquisitions. As the principal came due, it had no choice but to issue stock. Between 2004 and 2005, its share count went from 43 million to 84 million. When the dust settled, about 47% of the company had been sold for about $500 million, a staggering level of dilution by any measure.

**Shaw's Vietnam**

But if Shaw was a clumsy operator, it was an excellent visionary, always ready with a new vision to replace the old one that had just failed. When it acquired Stone & Webster back in 2000, it was the mighty possibility of the U.S. power market that justified the move. When this went sour (remember Enron?), it was the environmental and infrastructure sector that was supposed to be so

promising. In 2007, it was the nuclear sector's turn to be graced by Shaw's presence.

Nuclear, despite its promise, is a tough business, not so much because of competition, but because of the general difficulty of the projects, their long completion times, and the political/regulatory risks.

Into this field, Shaw jumped, and in 2008, it finally got its wish. It signed contracts to build nuclear reactors, two each, in Georgia and South Carolina. It was the first such project since Three Mile Island and a big deal for a company which had only entered the EPC field in 2000.

Then came the troubles. Permit delays and operational setbacks led to cost overruns. The nuclear projects became Shaw's Vietnam, and I am convinced that had the gallant CBI not come to the rescue with a $3.3 billion offer (very rich by any measure), Shaw would not have survived this quagmire. Now Shaw's problems have become CBI's problems, and much of CBI's recent travails are due to the mounting losses from Shaw's ambitious projects.

### Is CBI cheap?

In 2013, after acquiring Shaw, CBI reported its highest net income *ever* in its long, century-old life: $454 million. (It has since been surpassed by the 2014 earnings figure.) It also reported its lowest operating cash flow *ever* -- a negative $112 million.

Why this difference between income and cash flow? A couple reasons: First, there are the reserves. It is difficult to say exactly how much CBI booked because the figure is embedded in an account called "billings over costs and earnings" -- similar to deferred revenue. The release of these reserves would certainly account for at least part of the disparity between operating cash flow and net income.

The other reason is quite simply because the cost overruns related to the Shaw projects are not being recognized as losses. According to CBI, those are not really losses because contractually, they are entitled to be reimbursed for them, both by the owner and, if not by the owner, then by their partner, Westinghouse Electric. In the meantime, costs are being incurred and cash is flowing out, while non-cash earnings are being booked as assets.

This kind of accounting is far from conservative -- the cookie jar reserves especially are inexcusable -- but when it comes to the recognition of losses, one must remember that CBI is in the middle

18

of legal disputes with both the contractees and Westinghouse; and it is difficult to lay a claim to money that is being simultaneously written off in one's own reports. Doing this may be conservative accounting but it would weaken CBI's argument and boost the morale of its legal foes.

41.     Mr. Asherman and CB&I repeatedly offered guidance that the Nuclear Projects would have minimal, if any, impact on the Company, including on a July 30, 2012 analyst and investor call and at a Credit Suisse conference in June of 2013.

### CB&I STOCK WAS ARTIFICIALLY INFLATED

42.     On October 30, 2013, the Company disclosed in a Form 10-Q that:

> The $725.9 million net change in our accounts receivable, accounts payable and net contracts in progress balances was due to progress on the nuclear projects (approximately $455.0 million), working capital requirements and timing of collections and payments for our large cost-reimbursable projects (approximately $135.0 million), and timing of collections and payments on our large fixed-price projects (approximately $30.0 million). The decrease in accrued and other non-current liabilities was primarily due to the payment of acquisition-related costs and annual incentive plan and savings plan obligations, primarily during the first quarter.

43.     CB&I's October 30, 2013 Form 10-Q also stated "[o]f the $2,826,450[,000] of estimated total goodwill recorded in conjunction with the Shaw Acquisition, approximately $44,200[,000] is deductible for tax purposes." This was a sizable increase from the Company's prior quarter Form 10-Q, filed July 31, 2013, which noted "[t]he excess of the purchase price over the preliminary estimated fair value of the net tangible and identifiable intangible assets acquired totaling $2,446,701[,000], was recorded as goodwill."

44.     CB&I's February 27, 2014 Form 10-K stated that:

> The $815.5 million net change in our Contract Capital balances was due primarily to progress on the nuclear projects (approximately $540.0 million) and working capital requirements and timing of collections and payments for our large cost-reimbursable projects (approximately $270.0 million).

45.     CB&I's February 27, 2014 Form 10-K also stated "[o]f the $3,296,530[,000] total goodwill recorded in conjunction with the Shaw Acquisition, approximately $44,200[,000] is deductible for tax purposes and is associated with the remaining portion of goodwill previously deductible by Shaw."   The goodwill provision associated with Shaw had thus increased by approximately 17.5% in one quarter.

46.     On June 11, 2014, *SNL Electric Utility Report* reported in an article entitled "Moody's: Slowdown in nuclear renaissance increases litigation risks" that:

> The Nuclear Regulatory Commission has accused CB&I of violating regulations by falsifying test results. In response, the company is working to improve its "nuclear safety culture" at the facility.
>
> Problems with the contractors building the new reactors - a consortium led by CB&I and Westinghouse - have already been linked to potentially hundreds of millions of cost overruns for the project.
>
> Georgia Power said it will not accept certain components for use at its proposed Vogtle nuclear reactors until it can verify their quality. While it has seen "significant improvements" at the facility since the stop work order was placed in 2013, Georgia Power officials said the order will remain in effect. Georgia Power owns 45.7% of the roughly $15 billion project.
>
> The original impetus for the stop work order in January 2013 was that Georgia Power had issues with the quality of components coming out of the facility and other CB&I suppliers, the company said. In March, Georgia Power lifted the order for CB&I suppliers besides the Lake Charles facility but kept requiring "real-time oversight" until "the Lake Charles facility has demonstrated its ability to fabricate modules in compliance with licensing and quality requirements," according to a September 2013 filing with the PSC.
>
> At the hearing, company representatives said in response to questioning from the PSC that the order is needed for the company to ensure that the new reactors are built "to the highest level of quality."

Problems with the producing structures for the project's nuclear island, the foundation for the reactors, have already contributed to the project being delayed by a year. Georgia Power also said last year that its share of the project would cost $600 million more than it previously estimated, up to $6.85 billion.

In addition, Georgia Power's parent, Southern Co., is in a legal dispute with the contractors over which party is at fault for delays. About $900 million is at stake in the lawsuits that the parties have filed against each other.

\* \* \*

The NRC has said its investigations have found that in 2010, before the Lake Charles facility was acquired by CB&I, employees there falsified welder qualification tests, leading to a lack of "reasonable assurance that safety-related welding processes would be controlled and accomplished by qualified personnel in accordance with applicable codes and standards," according to a February letter. The violations were preliminary, and the NRC staff is still working on finalizing them, according to NRC spokesman Roger Hannah.

47.    From June 10 to 12, 2014, in response to information becoming public concerning CB&I and the associated cost overruns and delays at the Nuclear Projects, the price of CB&I's stock decreased from $83.30 per share to $76.72 per share, or almost 8%, on higher than average trading volume.

48.    On June 17, 2014, *SeekingAlpha.com* reported in an article entitled "Chicago Bridge & Iron: Acquisition Accounting Shenanigans Dramatically Inflate Profitability - Prescience Point Initiates At Strong Sell" that:

• CB&I has used creative acquisition accounting to create a $1.56B loss reserve that can be converted directly into gross profit to offset costs, thereby dramatically inflating reported profitability.

• CB&I is struggling with certain Shaw contracts that may prove to be severely loss making; the reserve is being used to mask their impacts and CB&I's increasingly fragile financial condition.

• Q1'2014 results confirm our expectations that CB&I continues to face headwinds, including continued losses, divergence of earnings and cash flow, and a rising dependency on debt.

• We believe CB&I will be forced into a goodwill write-down or financial restatement, either of which would trigger debt default, heightening the risk of liquidity crisis or dilutive equity raise.

• CBI reporting inflated profitability has resulted in a stock price inflated beyond reasonable measure. Based on our analysis, CB&I stock is worth ~$37 per share, 49% below current trading levels.

49.  CB&I's stock closed at $68.26/share on June 17, 2014, after having opened at $73.45/share.

50.  On July 24, 2014, the Company disclosed in a Form 10-Q:

*Operating Activities*—During the first six months of 2014, net cash used in operating activities was $374.4 million, primarily resulting from cash generated from earnings, offset by the net change in our accounts receivable, inventory, accounts payable and net contracts in progress account balances (collectively "Contract Capital") ($811.3 million, combined). Our contracts in progress balances represent our cash position relative to revenue recognized on projects, with (i) costs and estimated earnings in excess of billings representing an asset reflective of future cash receipts, and (ii) billings in excess of costs and estimated earnings representing a liability reflective of future cash expenditures and non-cash earnings.

* * *

Fluctuations in our Contract Capital balance, and its components, is not unusual in our business and is impacted by the size of our projects and changing mix of cost-reimbursable versus fixed-price backlog. Our cost-reimbursable projects tend to have a greater working capital requirement ("cost and estimated earnings in excess of billings"), while our fixed-price projects are generally structured to be cash flow positive ("billings in excess of costs and estimated earnings"). Our Contract Capital is particularly impacted by the timing of new awards and related payments in advance of performing work, and the achievement of billing milestones on backlog as we complete certain phases of work. Contract Capital is also impacted at period-end by the timing of accounts receivable collections and accounts payable payments for our large projects.

The $811.3 million decline in our Contract Capital liability for the first six months of 2014 was primarily due to progress on our two large U.S. nuclear power projects, with the remaining change due primarily to working capital requirements and the timing of receivable collections and accounts payable payments for several large projects in our Engineering, Construction and Maintenance and Fabrication Services operating groups. The Contract Capital liability for the two nuclear projects, exclusive of the margin fair value liability discussed above, was approximately $800.0 million and $1.2 billion at June 30, 2014 and December 31, 2013, respectively, representing a decline of approximately $434.0 million during the period. The Acquisition Closing Date Contract Capital liability, exclusive of the margin fair value liability, was related to significant advance payments received on the projects prior to the Acquisition and fair value adjustments related to cost to complete the projects. This Contract Capital position has been impacted by the partial utilization of the pre-acquisition advance payments and timing of achievement of subsequent billing milestones. This balance will continue to fluctuate prospectively based on the timing of future billings and collections and will ultimately decline as the projects progress. Although we anticipate additional decline for the nuclear power projects during the remainder of 2014, we expect the decline to be more than offset in the back half of the year by Contract Capital improvement from advance payments on our recent large awards and anticipated future awards, and improvement in our Contract Capital position from certain projects in our backlog. We expect this improvement, combined with cash generated from earnings, to result in overall positive operating cash flows for the back half of the year. Further, we believe our anticipated future operating cash flows and capacity under our revolving and other credit facilities will be sufficient to finance our capital expenditures, settle our commitments and contingencies and address our working capital needs for the foreseeable future.

51.     The July 24, 2014 Form 10-Q disclosed that the Company had "$3.3 billion [in goodwill] associated with the 2013 Shaw Acquisition."

52.     As a result of the July 24, 2014 disclosure, which was made after markets closed, the Company's stock price fell to $63.07 from the prior day's closing price of $69.48, on unusually high volume.

53.     On October 1, 2014, *The Acadiana Advocate* (Lafayette, LA) reported in an article entitled "Nuclear plant parts supplier agrees to changes at Louisiana factory" that:

> Chicago Bridge & Iron Co. agreed in a settlement with the U.S. Nuclear Regulatory Commission to strengthen its warnings against misconduct for workers at the plant. At the time of the infractions, the Lake Charles plant was owned by The Shaw Group in Baton Rouge. CBI acquired Shaw in February 2013.
>
> CBI must also watch for misconduct as part of existing oversight programs.
>
> CBI's factory makes parts for nuclear plants under construction in Georgia and South Carolina. The firms building and designing those plants are shifting production work away from CBI's Lake Charles facility because utility executives and analysts said it struggled to meet NRC quality rules and produce key components on time. NRC officials said the cheating did not cause any defective parts to leave the factory.
>
> CBI spokeswoman Gentry Brann did not return messages seeking comment Tuesday and Wednesday.
>
> The agreement was struck last week during negotiations between CBI and federal regulators.
>
> "The NRC pursued the mediation process with Chicago Bridge & Iron because we were able to get commitments for a broader range of corrective actions from the company in addressing the underlying issues," Patricia Holahan, acting director of NRC's Office of Enforcement, said in a statement.
>
> Federal officials have accused three factory employees of cheating on a welding test in April 2010, according to NRC documents summarizing the probe. Investigators accuse one welder of cheating by taking a qualification test for a co-worker. A test administrator allowed the test even though authorities said the administrator was aware of the misconduct. The names of the workers have not been released.

54.     On October 2, 2014, *The State* (Columbia, South Carolina) reported in an article entitled "Contractors say it will cost $1 billion more to finish new nuclear reactors at V.C. Summer" that:

The contractors building two new reactors at SCE&G's V.C. Summer nuclear plant in Fairfield County said Thursday it would cost an additional $1.2 billion to finish the work there.

However, SCE&G indicated they have not agreed to the consortium's new cost estimates nor any projected new completion dates.

Cayce-based SCANA Corp., the parent company of the electric utility, released a statement Thursday afternoon saying its construction and design consortium, primarily Chicago Bridge & Iron Co. and Westinghouse, informed them the increased preliminary cost estimates are needed to support project delays announced in August associated with engineering problems, fabrication and procurement of components and construction issues.

SCE&G, which owns 55 percent of the new two-reactor project, would be charged an additional $660 million to reach completion of the project, and Santee Cooper, which owns the remaining 45 percent, would be charged an additional $540 million to cover completion costs, SCANA said.

The CB&I and Westinghouse consortium told SCANA in August they were undertaking a full re-baselining of the V.C. Summer plant's Unit 2 and Unit 3 new reactors due to projected delays that would move completion of the Unit 2 reactor back to late 2018 or early 2019 and Unit 3's completion back a year beyond that to at least late 2019.

The $1.2 billion revised cost estimate issued by the engineering and construction consortium Thursday is in 2007 dollars, SCANA's announcement said, "and would be subject to escalation."

"It also excludes any owner's cost amounts associated with the delays, which amounts could be significant," the SCANA statement read. "The consortium's preliminary schedule and the cost estimate information are under review by SCE&G and Santee Cooper, and it is anticipated that further study, evaluation and negotiations will occur," SCANA said.

The two new reactors at Summer initially were supposed to cost $9.8 billion, which SCE&G has been allowed to begin collecting from ratepayers prior to power generation under the state Base Load Review Act. Charging customers up front is projected to cut finance costs of the project, ultimately costing ratepayers less.

> If the increased costs are to be added to the total cost of the reactor, SCE&G and the consortium will have to negotiate whose responsibility those increased costs fall to—SCE&G and its ratepayers or the consortium, which has had multiple delays with fabrication and delivery.

55.     Between October 1, 2014, and October 10, 2014, as the market digested this firm-specific information regarding past and ongoing problems at the Nuclear Projects, the Company's stock price dropped from more than $57.70 per share to $49.38 per share.

56.     On October 24, 2014, the Company disclosed in a Form 10-Q that there was still a "$3.3 billion [goodwill balance] associated with the 2013 Shaw Acquisition" and that:

> The $1.1 billion decline in our Contract Capital liability for the first nine months of 2014 was primarily due to progress on our two large U.S. nuclear projects, with the remaining change due primarily to working capital requirements and the timing of receivable collections and accounts payable payments for several large projects in our Engineering, Construction and Maintenance and Fabrication Services operating groups.

57.     On December 7, 2014, *The Associated Press* reported in an article entitled "State monitor warns on Ga. nuclear plant costs" that:

> ATLANTA (AP) — Public watchdogs are giving Southern Co. a between-the-lines warning that building a multibillion-dollar nuclear plant in Georgia without a detailed construction schedule could trigger financial penalties.
>
> That warning came in a report filed by a nuclear engineer and an analyst who work for state regulators and monitor the construction of two new reactors at Plant Vogtle in eastern Georgia.
>
> The Public Service Commission has warned for at least two years that Southern Co. subsidiary Georgia Power is relying on an outdated project schedule that contains almost no detail after December 2015, even though construction will continue for several more years.
>
> Nuclear engineer William Jacobs Jr. and financial analyst Steven Roetger said building a complex, first-of-its-kind project without a schedule was unreasonable.

"In fact it runs counter to any prudent project management, nuclear or otherwise," goes against the project's construction agreement and an industry group's own recommendations for construction, Jacobs and Roetger wrote in a semi-annual report.

That keyword — "prudent" — was meant to catch the ears of Southern Co. executives.

By law, the Public Service Commission can prevent Georgia Power, a regulated monopoly, from billing its customers for any construction costs the commission decides are the result of "imprudence."

The state's elected utility regulators have agreed to delay any final decisions on construction costs until after the first reactor is finished, likely in late 2017 at the earliest. However, the latest filing shows the commission's staffers are laying the legal groundwork that could be used in future arguments to prevent customers from paying some of Georgia Power's costs.

Georgia Power spokesman Brian Green said utility regulators have not objected to any construction costs so far. Regulators say utility executives are negotiating with Westinghouse Electric Co. and Chicago Bridge and Iron Co. to obtain a firm construction schedule and completion date.

"We feel like we're showing we're executing the project in a prudent way," Green said.

Three nuclear plants are under construction in the United States. Plant Vogtle in Georgia and the V.C. Summer nuclear plant in South Carolina use the same design and builders. In October, the owners of the South Carolina plant announced they faced more than $1 billion in potential costs. Meanwhile, the Tennessee Valley Authority is finishing a reactor at its Watts Bar plant in Tennessee that had been mothballed for years.

Georgia Power owns a 46 percent stake in the new plant. It estimates it will spend $6.7 billion for its share of construction, an increase of $591 million over the original state-approved budget. However, if the two reactors cannot be finished by the end of 2017 and 2018 as planned, costs will rise.

Georgia Power's budget estimate does not reflect the potential costs of resolving a roughly $1 billion lawsuit between the plant's builders and its owners over previous delays and design changes. While Georgia Power has denied any responsibility for those extra

costs, company leaders have said they would consider a settlement if it made financial sense.

58.     On December 10, 2014, *Power News* reported in an article entitled "Construction Monitor: Longer Delays Are Likely for Vogtle Reactors" that:

> The two nuclear reactors under construction at Plant Vogtle will be delayed beyond their forecast commercial operation dates of December 2017 and 2018, an oversight team told Georgia regulators in the project's latest construction monitoring report. The consortium building the project had originally projected the first of the two AP1000 reactors would be operational in April 2016. But Dr. William Jacobs, Jr., the Georgia Public Service Commission's (PSC's) independent construction monitor for the Plant Vogtle expansion, and Steven Roetger, who is among the staff involved in providing oversight of the project, now say in the Nov. 21-released report that "it is impossible to determine a reasonable forecast range as to when the units could be commercially available." A complete integrated project schedule (IPS) through the commercial operation date of each unit has not been provided to the oversight staff, the officials said. Meanwhile, Georgia Power Co. has not reaffirmed forecast commercial operation dates, saying only that it is working with contractors Westinghouse and Chicago Bridge & Iron (CB&I) to establish a more "detailed and comprehensive" integrated schedule date.

59.     From December 8 to 12, 2014, as the market digested this firm-specific information regarding past and ongoing problems at the Nuclear Projects, the Company's stock price dropped from $45.92 per share to $39.14 per share.

60.     The information above failed to disclose that CB&I was responsible for at least hundreds of millions of dollars of liability for overruns and delays related to the Nuclear Projects.

61.     On October 27, 2015, CB&I entered into a purchase agreement (the "Purchase Agreement" or "PA") with a subsidiary of Westinghouse Electric Company LLC ("Westinghouse"). The purchase price consisted of $0 at closing, subject to (i) a postclosing purchase price adjustment and (ii) potential deferred consideration and earnout payments.   As a

result, Westinghouse agreed to accept all liabilities related to cost overruns at the Nuclear Projects.

62.     Pursuant to the Purchase Agreement, on April 28, 2016, Westinghouse delivered CB&I a notice asserting that CB&I owed Westinghouse $2.15 billion in connection with the Nuclear Projects for liabilities "not recorded in accordance with GAAP" and Westinghouse further stated that CB&I should have also booked hundreds of millions of dollars in losses as a reserve liability.

63.     On July 21, 2016, CB&I sued for declaratory judgment to limit potential claims against it under the Purchase Agreement. *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Company LLC, et al.*, C.A. No. 12585-VCL (Del. Ch. Jun. 21, 2016). In its Complaint, CB&I alleges that its subsidiary, CB&I Stone & Webster Inc., a contractor, and Westinghouse, a designer of nuclear power plants, were part of a "consortium formed to build the first two nuclear power plants in the United States in more than three decades. Changes in Westinghouse's design led to delays and multi-billion dollar cost overruns for both parties." *Id.* at ¶ 1. CB&I further alleges that "Westinghouse submitted its improper claim [for over $2 billion] only after CB&I submitted its proper calculation of the working capital which would have had *Westinghouse owing CB&I* up to an additional approximately $428 million." *Id.* at ¶ 4 (emphasis in original).

64.     On July 22, 2016, CB&I Stock fell from $38.41/share to $35.40/share.

65.     In making a September 2, 2016 motion for judgment on the pleadings Westinghouse reserved its rights to bring claims for "actual fraud" related to the Purchase Agreement "in light of information that has surfaced in the course of the post-closing process."

*Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Company LLC, et al.*, C.A. No. 12585-VCL, at 13 n.5 (Del. Ch. Sept. 2, 2016).

66.    Vice Chancellor Laster issued an order granting Westinghouse's motion for judgment on the pleadings on December 2, 2016 (the "Order"), and a Memorandum Opinion dismissing CB&I's civil lawsuit against Westinghouse on December 5, 2016 (the "Opinion"). *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Company LLC, et al.*, C.A. No. 12585-VCL (Del. Ch.).  In the Opinion, Vice Chancellor Laster agreed with Westinghouse that under the Purchase Agreement the mandatory path for resolving the parties' disagreements was through an Independent Auditor.  CB&I filed a Notice of Appeal from the Opinion and Order on December 5, 2016 (the "Appeal").

67.    Later that month, on December 27, 2016, in a *DealBook* article entitled "Toshiba Could Lose Billions From Troubled U.S. Nuclear Power Deal," *The New York Times* reported that Toshiba warned that it might need to write off "several billion U.S. dollars" as a result of its subsidiary Westinghouse's purchase of CB&I Stone & Webster.

68.    On February 12, 2017 *Bloomberg*[5] reported, in part, that:

> At Southern's two new reactors in Georgia — a massive construction site on the edge of the Savannah River — thousands of workers have logged more than 25 million man-hours, yet the project is years behind schedule.
>
> Originally planned to open in 2016 and 2017, they're now slated for 2019 and 2020 — and that may be a stretch. To hit the new targets, Westinghouse would have to accelerate the pace of work to "over three times the amount that has ever been achieved to date," Jacobs, the state's project monitor, told the utility commission last year.

---

[5] https://www.bloomberg.com/news/articles/2017-02-13/toshiba-s-nuclear-reactor-mess-winds-back-to-a-louisiana-swamp

> In November, Westinghouse said 33.4 percent of the construction
> was complete, but a utility supervisor with Southern who asked not
> to be identified said he's skeptical. The hardest part of the project
> — the reactor's center — has just started, he said.

69.     Westinghouse filed for Chapter 11 bankruptcy on March 29, 2017.  According to

a March 31, 2017 *Forbes* article entitled "Westinghouse Bankruptcy Shakes the Nuclear World,"

"[t]he cause of this latest problem seems to have nothing to do with nuclear power and

everything to do with incompetent business practices, particularly Toshiba's construction

contractor."[6]  In analyzing a Bloomberg article, *Forbes* reported that "the choice of Shaw Group

to be the main contractor was foolish and costly blow to the project."

70.     After full briefing on the Appeal, the Delaware Supreme Court held oral argument

on May 3, 2017.  *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Company LLC,*

*et al.*, Case No. 573, 2016 (Del.).   According to a May 3, 2017 *Reuters* article entitled

"Westinghouse, CB&I spar in court over $2 billion merger dispute," Chief Justice Strine

"pressed the parties several times to explain why the case should not be returned to the lower

court for discovery and a possible trial to determine the intent of the parties when they drafted

the Shaw sale agreement."[7]

71.     As of June 5, 2017, CB&I's stock was down 40.8% over the prior three months

and 40.2% over the prior six months.  The stock has returned -49.7% over the last year,[8] and the

Company's market capitalization is less than its potential liabilities as of the filing of this

Complaint.

---

[6] https://www.forbes.com/sites/jamesconca/2017/03/31/westinghouse-bankruptcy-shakes-the-nuclear-world/#2e9e38a42688

[7] http://www.reuters.com/article/us-toshiba-accounting-westinghouse-cbi-idUSKBN17Z2AF

[8] *See* http://news.cmlviz.com/2017/06/05/stock-volatility-risk-alert-chicago-bridge--iron-company-n-v-realized-volatility-hits-a-towering-high.html

**WHAT DEFENDANTS SHOULD HAVE DONE DURING THE CLASS PERIOD**

72.     Defendants, as CB&I insiders, knew or should have known that Company Stock was artificially inflated as a result of construction delays and cost overruns on contracts to complete construction of the Nuclear Projects during the Class Period identified herein. Defendants should have taken action to protect the Plans from holding and purchasing artificially inflated CB&I Stock.  Instead, Defendants did the opposite, and effective January 1, 2014, the Plan was amended and restated to allow Participants to transfer a portion of their account balance into the CB&I N.V. stock fund as long as the transfer does not cause the balance of the Participant's accounts held in the CB&I N.V. stock fund to exceed 20% of the Participant's entire account balance.

73.     Disclosure might not have prevented the Plans from taking an inevitable loss on Company Stock it already held, but it would have prevented the Plans from acquiring (through Participants' uninformed investment decisions and continued investment of matching contributions) additional shares of artificially inflated Company Stock.  The longer the concealment continued, the more of the Plans' good money went into a bad investment; full disclosure would have cut short the period in which the Plans bought Company Stock at inflated prices.

74.     Rather than doing nothing (as they did), Defendants could have taken numerous steps to fulfill their fiduciary duties to the Plan under ERISA.  As set forth more fully below, none of those steps (a) would have violated securities laws or any other laws, or (b) would not have been more likely to harm the Plans' CB&I Stock holdings than to help it, and could have avoided or mitigated the harm caused to the Plans.

75.     Defendants could have (and should have) directed that all Company and Plan Participant contributions to the Company Stock Fund be held in cash or some other short-term

investment rather than be used to purchase CB&I Stock. A refusal to purchase Company Stock is not a "transaction" within the meaning of insider trading prohibitions and would not have required any independent disclosures that could have had a materially adverse effect on the price of CB&I Stock.

76.     Defendants also should have closed the Company Stock Fund to further contributions and directed that contributions be diverted from Company Stock into prudent investment options based upon the Participants' instructions or, if there were no such instructions, the Plans' default investment option.

77.     Neither of these actions would have implicated, let alone been in violation of, federal securities laws or any other laws. Nor would the Plans ceasing to purchase additional Company Stock likely send a negative signal to the market.

78.     Alternatively, Defendants could have disclosed (or caused others to disclose) CB&I's construction delays and cost overruns on contracts to complete construction of the Nuclear Projects so that CB&I Stock would trade at a fair value.

79.     Given the relatively small number of shares of CB&I Stock purchased by the Plans when compared to the market float of CB&I Stock, it is extremely unlikely that this decrease in the number of shares that would have been purchased, considered alone, would have had an appreciable impact on the price of CB&I Stock.

80.     Further, Defendants also could have:

- sought guidance from the DOL or SEC as to what they should have done;

- resigned as Plan fiduciaries to the extent they could not act loyally and prudently; and/or

- retained outside experts to serve either as advisors or as independent fiduciaries specifically for the Fund.

81.     Instead of taking any of the above actions, or any other action, to protect the Plans, Defendants ignored the artificial inflation in Company Stock in administering their fiduciary duties. Defendants knew that the Plan was intended to be a safeguard for Participants' retirement savings, and that Participants' contributions were being wasted, in part, by being invested in artificially inflated CB&I Stock.

**Defendants Allowed CB&I's Stock to be Hyped Instead of Protecting the Plans**

82.     During the Class Period, CB&I and the other Defendants continued to issue misstatements about CB&I's construction delays and cost overruns on contracts to complete construction of the Nuclear Projects, keeping CB&I Stock artificially inflated while failing to take any of the above noted actions.  Scope of construction delays and cost overruns on contracts to complete construction of the Nuclear Projects would only fully be disclosed years later.

**THE RELEVANT LAW: CLAIMS FOR RELIEF UNDER ERISA**

83.     ERISA requires that every plan name one or more fiduciaries who have "authority to control and manage the operation and administration of the plan."  ERISA § 1102(a)(1). Additionally, under ERISA, any person or entity, other than the named fiduciary that in fact performs fiduciary functions for the Plans, is also considered a fiduciary of the Plans.  A person or entity is considered a plan fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

84.    At all relevant times, Defendants are/were, and acted as, fiduciaries within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

85.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

86.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

87.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

88.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the highest known to the law and entail, among other things:

(a)    the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b)    the duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the

participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c)    the duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

89.    Accordingly, if the fiduciaries of a plan know, or if an adequate investigation would reveal, that an investment option is no longer a prudent investment for that plan, then the fiduciaries must disregard any plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other, suitable, prudent investments.

90.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

91.    Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## COUNT I

### FAILURE TO PRUDENTLY MANAGE THE PLANS' ASSETS IN VIOLATION OF ERISA §§ 404(a)(1)(B) AND 405

### (BY THE COMPANY AND THE COMMITTEE DEFENDANTS)

92.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

93.     This Count alleges fiduciary breaches against the Company and the Committee and Administrator Defendants (collectively, the "Prudence Defendants") for continuing to allow the investment of the Plans' assets in CB&I Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because CB&I Stock was artificially inflated during the Class Period.

94.     At all relevant times, as alleged above, the Prudence Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plans and/or disposition of the Plans' assets.

95.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that all investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Prudence Defendants were responsible for ensuring that all investments in Company Stock in the Plans were prudent.  The Prudence Defendants are liable for losses incurred as a result of such investments being imprudent.

96.     Upon information and belief, Defendants failed to engage in a reasoned decision-making process regarding the prudence of CB&I Stock.   An adequate investigation by

Defendants would have revealed the risks of investing in artificially inflated CB&I Stock and caused a reasonable fiduciary to conclude that the Fund was over-valued and likely to fall in price during the Class Period. A prudent fiduciary would have acted to prevent or mitigate the losses that the Plans experienced during the Class Period, but the Defendants failed to do so.

97.     The Prudence Defendants breached their duties to prudently manage the Plans' assets.  During the Class Period, the Prudence Defendants knew or should have known that, as described herein, Company Stock was not a suitable and appropriate investment for the Plans. Yet, during the Class Period, despite their knowledge of the imprudence of the investment, the Prudence Defendants failed to take any meaningful steps to protect the Plans' Participants.

98.     The Prudence Defendants also breached their duty of prudence by failing to provide complete and accurate information regarding CB&I's true financial condition and, generally, by conveying inaccurate information regarding the Company's business and industry. During the Class Period, upon information and belief, Defendants fostered a positive attitude toward Company Stock, and/or allowed Participants to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning the imprudence of investment in Company Stock.  As such, Participants could not appreciate the true risks presented by investments in Company Stock and therefore could not make informed decisions regarding their investments in the Fund.

99.     As a result of Defendants' knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning CB&I's business activities, any generalized warnings of market and diversification risks that Defendants made to Participants regarding the Plans' investment in the Fund did not effectively inform the Participants of the past, immediate, and future dangers of investing in Company Stock.

100.    The Prudence Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plans from inevitable losses.  The Prudence Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plans, yet the Prudence Defendants made no effort to remedy those breaches.

101.    As a direct and proximate result of the breaches of fiduciary duties during the Class Period alleged herein, the Plans and, indirectly, the Plans' Participants, lost a significant portion of their retirement investments.  Had the Prudence Defendants taken appropriate steps to comply with their fiduciary obligations during the Class Period, Participants could have liquidated some or all of their holdings in Company Stock, and refrained from spending hundreds of millions of dollars on artificially inflated CB&I Stock, and thereby eliminated, or at least reduced, losses to the Plans and themselves.

102.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by Defendants' breaches of fiduciary duties alleged in this Count.

## COUNT II

### BREACH OF DUTY OF LOYALTY IN
### VIOLATION OF ERISA §§ 404(a)(1)(A) AND 405

### (BY ALL DEFENDANTS)

103.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

104.    This Count alleges fiduciary breaches against the Company, Monitoring Defendants and Committee and Administrator Defendants (collectively, the "Loyalty Defendants"), for continuing to allow the investment of the Plans' assets in CB&I Stock

throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because CB&I Stock was artificially inflated during the Class Period.

105.    At all relevant times, as alleged above, the Loyalty Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

106.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty; that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

107.    The duty of loyalty includes the duty to speak truthfully to the Plans and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.  As the Supreme Court "succinctly explained" in *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996), "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries."

108.    During the Class Period, the Loyalty Defendants breached their duty to avoid conflicts of interest and to promptly resolve them, by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plans' investments in Company Stock (even though an independent fiduciary was appointed soon after CB&I Stock ceased being artificially inflated); and, by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plans' investment in the Company's securities.

109.    During the Class Period, upon information and belief, certain Defendants, including the Monitoring Defendants, made direct and indirect communications with the Plans' participants in which they omitted or misrepresented information regarding or materially related to investments in Company Stock.  These communications included, but were not limited to, conference calls with analysts, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions).  Defendants, including the Monitoring Defendants, also acted as fiduciaries to the extent of this communication activity.

110.    Further, Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press, concerning employees' natural bias toward investing in company stock, including that:

(a)    Out of loyalty, employees tend to invest in company stock;

(b)    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(c)    Employees tend not to change their investment option allocations in the plan once made; and

(d)    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk.

111.    Knowing of these natural biases toward investment of Company Stock, Defendants should have been on high alert to protect the interests of the Plans' participants. Defendants, however, disregarded their duties of loyalty, to the benefit of the Company, as demonstrated by the Plans' massive holding and purchase of Company Stock with the Plans' assets.

112.    Further, to the extent that CB&I satisfied its Plan matching obligations using artificially inflated employer securities which it already held, Defendants, who knew or should have known CB&I Stock was artificially inflated, participated knowingly and significantly in deceiving Participants in order to save the employer money at the Participants' expense, which violates ERISA's duty of loyalty.

113.    The Loyalty Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plans from inevitable losses.  The Loyalty Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plans, yet the Loyalty Defendants made no effort to remedy them.

114.    As a consequence of the Loyalty Defendants' breaches of fiduciary duty during the Class Period by putting the interests of themselves and the Company ahead of the Plans and its participants, the Plans suffered tens of millions of dollars in losses, as its holdings of Company Stock were devastated.  If the Loyalty Defendants had discharged their fiduciary duties to loyally manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans and, indirectly, Plaintiff and the other Participants, lost a significant portion of their retirement investments.

115.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**COUNT III**

**FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES
AND PROVIDE THEM WITH ACCURATE INFORMATION
IN VIOLATION OF ERISA § 404**

**(BY THE COMPANY AND THE MONITORING DEFENDANTS)**

116.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

117.     This Count alleges fiduciary breaches against the Monitoring Defendants.

118.     At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose and prudence.

119.     As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of, other fiduciaries of the Plans, namely the Prudence Defendants.

120.     Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

121.     The monitoring duty further requires that the appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently

concluding that their appointees were faithfully and effectively performing their obligations to a plan's participants or for deciding whether to retain or remove them.

122.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

123.    During the Class Period, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    failing, at least with respect to the Plans' investment in Company Stock, to properly monitor their appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of the appointees' imprudent actions and inaction with respect to Company Stock;

(b)    failing to ensure that the monitored fiduciaries appreciated the true extent of the Company's precarious financial situation and the likely impact that financial failure would have on the value of the Plans' investment in Company Stock;

(c)    to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets and, in particular, the Plans' investment in Company Stock; and

(d)    failing to remove appointees whose performance was inadequate in that they continued to permit the Plans to make and maintain investments in the Company Stock despite the practices that rendered it an imprudent investment during the Class Period.

124.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided.

125.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, and enabled the breaches by those Defendants, and they failed to make any effort to remedy those breaches despite having knowledge of them.

126.    Therefore, as a direct and proximate result of the breaches of fiduciary duty by the Monitoring Defendants during the Class Period alleged herein, the Plans and, indirectly, the Plans' Participants and beneficiaries, lost tens of millions of dollars of retirement savings.

127.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

128.    The wasting of Participants' retirement savings in artificially inflated CB&I Stock could have and would have been avoided, in whole or in part, by Defendants complying with their ERISA-mandated fiduciary duties.

129.    Defendants—who knew or should have known that CB&I Stock was an imprudent retirement investment—chose to, as fiduciaries, continue allowing the Plan to acquire further CB&I Stock, while taking no action to protect their wards as CB&I's condition worsened and the Participants' retirement savings lost millions of dollars.  Prudent fiduciaries would have acted otherwise and taken appropriate actions to protect the Plans and the Participants.

130.    To the extent Defendants were required to take action based on non-publicly disclosed information that they were privy to, at least the following alternative options—which are pled as alternative statements under FED. R. CIV. P. 8(d)(2) to the extent they are inconsistent—were available to Defendants and (a) could have been done without violating securities laws or any other laws, (b) should have been done to fulfill Defendants' fiduciary obligations under ERISA, and (c) would not have been more likely to harm the Plan than to help it.

131.    First, Defendants could have and should have directed that all Company and Participant contributions to the Company Stock Fund be held in cash rather than be used to purchase CB&I Stock.  The refusal to purchase Company Stock is not a "transaction" within the meaning of insider trading prohibitions.  This action would not have required any independent disclosures that could have had a materially adverse effect on the price of CB&I Stock.

132.    Second, Defendants should have closed the Fund to further contributions and directed that contributions be diverted from Company Stock into other (prudent) investment options based upon Participants' instructions or, if there were no such instructions, the Plans' default investment option.

133.    Third, Defendants could have disclosed CB&I's problems, discussed above, so that CB&I Stock ceased being artificially inflated.

134.    Alternatively, Defendants could have:

- sought guidance from the DOL or SEC as to what they should have done;

- resigned as fiduciaries of the Plans to the extent they could not act loyally and prudently; and/or

- retained outside experts to serve either as advisors or as independent fiduciaries specifically for the Fund.

135.    Instead, Defendants waited until the Plans had suffered tens of millions of dollars in losses during the Class Period because of artificial inflation in CB&I Stock to take any of the protective actions discussed above.

## REMEDIES FOR BREACHES OF FIDUCIARY DUTY

136.    As noted above, as a consequence of Defendants' breaches, the Plans suffered significant losses.

137.    ERISA § 502(a), 29 U.S.C. § 1132(a), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan. . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate. . . ."

138.    As noted above, the Plans and its Participants have suffered tens of millions of dollars in damages as a result of Defendants' breaches of fiduciary duty.  Plaintiff, the Plans, and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans for the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

139.    Each Defendant is jointly and severally liable for the acts of the other Defendants as a co-fiduciary.

## JURY DEMAND

Plaintiff demands a jury.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A.      A judgment that the Defendants, and each of them, breached their ERISA fiduciary duties to the Plans and the Participants during the Class Period;

B.      A judgment compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.      A judgment imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.      A judgment awarding actual damages in the amount of any losses the Plans suffered, to be allocated among the Plans participants' individual accounts in proportion to the accounts' losses;

E.      A judgment requiring that Defendants allocate the Plans' recoveries to the accounts of all Participants who had any portion of their account balances invested in CB&I Stock maintained by the Plans in proportion to the accounts' losses attributable to the decline in the price of CB&I Stock;

F.      A judgment awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      A judgment awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.    A judgment awarding equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated: June 6, 2017

By:  /s/Michael J. Klein
Michael J. Klein
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022
Email: mklein@ssbny.com

**ATTORNEYS FOR PLAINTIFF**