## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAMESH C. KINRA, on behalf of the Chicago Bridge & Iron Savings Plan, The Shaw Group Inc. 401(k) Plan, himself, and a class consisting of similarly situated participants of the Plans, <br><br>           Plaintiff, <br><br>     v. <br><br> CHICAGO BRIDGE & IRON COMPANY, INVESTMENT COMMITTEE, PLAN ADMINISTRATOR, STEPHEN H. DIMLICH, JR., WESTLEY S. STOCKTON, SHEILA FELDMAN, LUCIANO REYES, TRAVIS STRICKER, BRIAN MIMS, DENNIS FOX, SCOTT WAGUESPACK, MISTY PALMER, LANCE BOWLING, JOE CHRISTALDI, JOHN DOES 1-20, and RICHARD ROES 1-20, <br><br>           Defendants. | Case No. 1:17-cv-04251 <br><br><br> **AMENDED CLASS ACTION** <br> **COMPLAINT** (REDACTED) <br><br><br> **JURY TRIAL DEMANDED** |

## NATURE OF THE ACTION

1.      Plaintiff Ramesh C. Kinra ("Plaintiff"), on behalf of the Chicago Bridge & Iron Savings Plan (the "Plan"),[1] individually, and as representative of the class described herein, brings this action against the herein named defendants (collectively "Defendants") pursuant to §§ 404, 405, 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1109 and 1132.[2]

---

[1] Effective January 1, 2016, the Plan was amended and restated to merge the Plan with The Shaw Group Inc. 401(k) Plan (the "Shaw Plan" and together with the Shaw Plan the "Plans"). This action is also brought derivatively on behalf of the Shaw Plan and its assets.

[2] All allegations contained herein are based upon personal information as to Plaintiff and the investigation of Plaintiff's counsel. In particular, Plaintiff, through his counsel, has reviewed, among other things, documents filed with the United States Department of Labor (the "DOL")

2.     This case is about the failure of the Defendants, fiduciaries of the Plans, to protect the interests of the Plans' Participants in violation of the Defendants' legal obligations under ERISA.  Defendants breached the duties they owed to the Plans, to Plaintiff, and to the putative class members who are also Participants, by, *inter alia*, retaining common stock of CB&I ("CB&I Stock" or "Company Stock") as an investment option in the Plans and allowing the Plans to continue to purchase Company Stock when a reasonable fiduciary using the "care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use" would have done otherwise.  *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

3.     The Defendants permitted the Plans to continue to offer CB&I Stock as an investment option to Participants even after the Defendants knew or should have known that CB&I Stock was artificially inflated during the Class Period (October 29, 2013, through the present), as alleged in further detail below, making it an imprudent retirement investment for the Plans given their purpose of helping Participants save for retirement.  Defendants knew or should have known that material facts about CB&I's business had not been disclosed to the market, causing CB&I Stock to trade at prices above which it would have traded had such facts been disclosed.  Defendants were empowered as fiduciaries to remove CB&I Stock from the Plans' investment options or to take other measures to help Participants, yet they failed to do so or to act in any way to protect the interests of the Plans or their Participants, in violation of Defendants' legal obligations under ERISA.

4.     In *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), the Supreme Court confirmed that plan fiduciaries violate ERISA when they continue to offer an imprudent

---

and the United States Securities and Exchange Commission (the "SEC"), other lawsuits against Chicago Bridge & Iron Company N.V. ("CB&I" or the "Company"), public statements and media reports, and also had discussions with participants and beneficiaries (the "Participants") of the Plans.

plan investment option.  In *Fifth Third*, the Court considered a class action case similar to this one in which plan participants challenged the plan fiduciaries' failure to remove company stock as a plan investment option.  The Supreme Court confirmed that ERISA fiduciaries are required to independently determine whether company stock remains a prudent investment option.  In that case, the defendant-fiduciaries argued that their decision to buy or hold company stock was entitled to a fiduciary-friendly "presumption of prudence" standard.  *Fifth Third*, 134 S. Ct. at 2463.  The Supreme Court rejected that argument, holding that "no such presumption applies," *id.,* and further held "that the duty of prudence ***trumps*** the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary."  *Id.* at 2468 (citation omitted) (emphasis added).  Accordingly, the Plans' "fiduciaries are subject to the same duty of prudence that applies to ERISA fiduciaries in general."  *Id*. at 2463.  Thus, even if the Plans purportedly required that CB&I Stock be offered, the Plans' fiduciaries were obligated to disregard that directive once Company Stock was no longer a prudent investment for the Plans.

5.     The thrust of Plaintiff's allegations under Counts I (breach of the duty of prudence) and II (breach of the duty of loyalty) is that Defendants allowed the investment of the Plans' assets in CB&I Stock throughout the Class Period despite the fact that Defendants knew or should have known that that investment was imprudent as a retirement vehicle for the Plans.

6.     CB&I Stock was artificially inflated during the Class Period and the Plans wasted assets by purchasing artificially inflated CB&I Stock.  During the Class Period, among other things, the Company failed to disclose that it was responsible for hundreds of millions of dollars in liability and had improperly accounted for its goodwill during 2013 to cover losses associated with construction delays and cost overruns on contracts to complete construction of new nuclear

power plants in Waynesboro, Georgia and Jenkinsville, South Carolina (the "Nuclear Projects"), while simultaneously negotiating to give away its subsidiary, CB&I Stone & Webster Inc. ("Stone"), acquired through its acquisition of Shaw Group Inc. ("Shaw"), to Westinghouse Electric Company LLC ("Westinghouse").  As recognized by Justice Strine, "[t]he parties came to that figure [for the sale of Stone to Westinghouse for $0.00] in part by considering Stone's historical financial statements and management projections and by basing it upon a target for Stone's net working capital—its current assets less current liabilities—of $1.174 billion." *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Company LLC, et al.*, Case No. 573, 2016 (Del. June 27, 2017) (the "Supreme Court Action").

7.     Given the totality of circumstances prevailing during the Class Period, no prudent fiduciary could have made the same decision as was made by Defendants here to retain and/or continue purchasing the clearly imprudent CB&I Stock as investment in the Plans.  To remedy the breaches of fiduciary duties as described herein, Plaintiff seeks to recover the financial losses suffered by the Plans as a result of the diminution in value of Company Stock invested in the Plans during the Class Period, and to restore to the Plans what Participants would have received if the Plans' assets had been invested prudently.

## JURISDICTION AND VENUE

8.     ***Subject Matter Jurisdiction.***  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9.     ***Personal Jurisdiction.***  This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

10.    ***Venue.***  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans are administered in this District, some or all of the fiduciary

breaches for which relief is sought occurred in this District, and a related securities action (*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Chicago Bridge & Iron Company N.V., et al.*, No. 17-cv-01580) is pending in this District.

## PARTIES

**Plaintiff**

11.     Plaintiff Ramesh C. Kinra was a CB&I employee and is a Participant in the Plans, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  Plaintiff suffered losses in his individual Plan account as a result of investing in CB&I Stock during the Class Period.

**Defendants**

**(a)**     **Company Defendant**

12.     Defendant CB&I provides a range of services to customers in the energy infrastructure market across the world. The Company provides various services, such as conceptual design, technology, engineering, procurement, fabrication, modularization, construction, commissioning, maintenance, program management and environmental services. It operates through four segments. Its Engineering and Construction segment provides engineering, procurement, and construction ("EPC") services. Its Fabrication Services segment provides fabrication and erection of steel plate structures; fabrication of piping systems and process modules, and manufacturing and distribution of pipe and fittings. Its Technology segment provides licensed process technologies and catalysts for use in petrochemical facilities and oil refineries. Its Capital Services operating group provides environmental engineering and remediation, infrastructure EPC services and program management.

13.     At all times relevant to this Amended Complaint (the "Complaint"), the Company managed and administered the Plans and the assets of the Plans and acted as a fiduciary with respect to the Plans, or appointed a committee to do so.  According to Section 9.01 of the Plan's

5

governing document, as amended and restated as of January 1, 2014 (the "2014 Plan Document"),[3] "[t]he Company shall have overall responsibility for the administration and operation of the Plan, which the Company shall discharge by the appointment and removal (with or without cause) of the Trustee, the Investment Committee and the Plan Administrator."

14.    At all relevant times, the Company was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

15.    The Company maintains in office in this District at 1251 Avenue of the Americas, Suite 750, New York, New York 10020.

**(b)    The Committee and Plan Administrator Defendants**

16.    Defendant Investment Committee (the "Committee") is a fiduciary of the Plans pursuant to the 2014 Plan Document, which states in relevant part that:

> 6.06 **Investment Committee**. The Company shall appoint an Investment Committee composed of one (1) or more persons who are officers, directors or employees of the Company or a Related Company to select Investment Funds, to appoint and remove any Investment Manager, to engage consultants, to formulate an investment policy, to monitor the performance of Investment Funds and Investment Managers, and to perform such other functions with respect to the investment of the assets of the Plan as the Company may direct. Each member of the Committee shall serve until death, resignation, removal, or until he or she ceases to be an officer, director or employee of any of the Company and any Related Company. Any member of the Committee may resign upon fifteen (15) days written notice to the Company. The Company may remove any member of the Committee upon fifteen (15) days written notice to such member and all other members of the Committee. If a vacancy occurs in the membership of the

---

[3] The 2014 Plan Document was filed as Exhibit 10.13 to a Form 10-K filed by CB&I on February 27, 2014. It was also produced by the Company as part of a production to Plaintiff's counsel.

Committee the Company may (and if there would otherwise be no members of the Committee, shall) appoint a successor member of the Committee who shall have the same powers and duties as those conferred upon his or her predecessor(s). The Company shall advise the Trustee, any Investment Manager and the Plan Administrator of the membership of the Committee and of any change therein; and the Trustee, any Investment Manager and the Plan Administrator shall be protected in reliance on any such notice. The Committee shall act at a meeting, or in writing without a meeting, by the vote or concurrence of a majority of its members; provided, however, that no member of the Committee who is a Participant shall take part in any action having particular reference to his or her own benefits hereunder. All written directions by the Committee may be made over the signatures of a majority or its members and all persons shall be protected in relying on such written directions.

17.     Defendant Plan Administrator (the "Plan Administrator") is the administrator for

the Plans pursuant to the 2014 Plan Document, which states in relevant part that:

9.02 **Plan Administrator Rights and Duties**. The Plan Administrator shall administer and enforce the Plan and the Trust in accordance with the terms of the Plan and the Trust Agreement and shall have all powers necessary to accomplish that purpose, including but not by way of limitation, the following, all to be exercised in the sole and absolute discretion of the Plan Administrator:

(a) To issue rules, regulations and procedures and prescribe forms necessary for the proper conduct and administration of the Plan and to change, alter, or amend such rules, regulations and procedures and forms;

* * *

(f) To employ and compensate such accountants and attorneys (who may but need not be the accountants or attorneys of the Company) and other persons to render advice, and such clerical employees as the Plan Administrator may deem necessary to the performance of his, her or its duties;

* * *

(m) To do all other acts and things necessary he, she or it deems in his, her or its sole discretion to be necessary or appropriate for the administration of the Plan.

18.     Defendant Stephen H. Dimlich, Jr., CB&I's Senior Vice President, Corporate Human Resources, signed a Form 11-K Annual Report filed by the Plan with the SEC on June 27, 2014 (the "2014 11-K"), and a Form 11-K Annual Report filed by the Plan with the SEC on June 26, 2015 (the "2015 11-K") on behalf of the Plan Administrator.          Redacted

.  *See* CB&I000564, 661, 666, 805, 807, 810, 813.          Redacted

*See* CB&I000671.

19.     Defendant Westley S. Stockton, CB&I's Vice President, Corporate Controller and Chief Accounting Officer, signed the 2014 11-K, the 2015 11-K, and a Form 11-K Annual Report filed by the Plans with the SEC on June 23, 2016 (the "2016 11-K") on behalf of the Plan Administrator. Defendant Stockton sold a significant amount of CB&I Stock during the Class Period.

20.     Defendant Sheila Feldman, CB&I's Executive Vice President, Chief Human Resources Officer, signed the 2016 11-K on behalf of the Plan Administrator.

21.     Defendant Luciano Reyes was the Company's Vice President and Treasurer during times relevant herein.          Redacted

*See* CB&I000661, 671, 765, 810.          Redacted

Redacted

*See* CB&I000564, 666.

22.     Defendant Travis Stricker was the Company's Vice President, Financial

Operations during times relevant herein.                Redacted

*See* CB&I000564, 661, 666, 671, 760, 763, 765, 772, 805, 807, 810.

23.     Defendant Brian Mims was the Company's Assistant General Counsel during

times relevant herein.                Redacted

*See* CB&I000564, 805, 807, 813.

Redacted

CB&I000661, 666, 671, 765.

24.     Defendant Dennis Fox was the Company's Director, Corporate Benefits &

Compensation during times relevant herein.                Redacted

*See* CB&I000564, 661, 666, 671, 760, 763,

765, 769, 772, 805, 807, 810, 813.

25.     Defendant Scott Waguespack was the Company's Senior Director, Human Resources during times relevant herein.                        Redacted

*See* CB&I000564, 661, 760, 769, 772, 805, 807.   Redacted

CB&I000666, 671, 765.

26.     Defendant Misty Palmer was the Company's Employee Benefits Manager during times relevant herein.                        Redacted

*See* CB&I000760, 763, 765, 769, 772.

27.     Defendant Lance Bowling was the Company's Senior Associate General Counsel during times relevant herein.                        Redacted

CB&I000760, 763, 769, 772.

28.     Defendant Joe Christaldi was the Company's Director, Global Cash Management during times relevant herein.                        Redacted

CB&I000760, 763, 769, 772.

29.     John Does 1-20, without limitation, are the unknown Plan Administrators, members of the Committee, or any other committee(s) which administered the Plans, and all members thereof.  The identities of the committee(s) and the members of the committee(s) which were responsible for carrying out the provisions of the Plans are currently not known.  John Does 1-20 are fiduciaries of the Plans and are believed to be employees of the Company.

30.     The Defendants named in ¶¶ 16-29 herein are referred to herein as the "Committee and Administrator Defendants."

31.     At all relevant times, the Committee and Administrator Defendants and the John Doe defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

### (c)     The Monitoring Defendants

32.     Defendants Richard Roes 1-20 (together with the Company the "Monitoring Defendants") were persons who had the duty and responsibility to properly appoint, monitor and inform the Committee and Administrator Defendants and John Doe Defendants (as defined herein) and/or other persons who exercised day-to-day responsibility for the management and administration of the Plans and their assets.  The Monitoring Defendants failed to properly appoint, monitor and inform such persons in that the Monitoring Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the Monitoring Defendants did adequately inform such persons of the true financial and operating condition of the Company (including construction delays and cost overruns on contracts to complete construction of the Nuclear Projects during the Class Period identified herein) but nonetheless continued to allow such persons to offer CB&I Stock as an investment

option under the Plans when the market price of CB&I Stock was artificially inflated and CB&I

Stock was an imprudent investment for Participants' retirement accounts under the Plans.

Liability is only asserted against each of the Monitoring Defendants for such periods of time as

the Monitoring Defendants acted as a fiduciary with respect to the Plans.

33.     At all relevant times, the Richard Roe defendants were fiduciaries of the Plans

within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised

discretionary authority or control over the administration and/or management of the Plans or

disposition of the Plans' assets.

**(d)     Additional "John Doe Defendants"**

34.     To the extent there are additional officers and employees of CB&I who were

fiduciaries of the Plans during the Class Period, or any other committees or members of such

committees that were fiduciaries of the Plans in connection with the allegations herein, the

identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their

identities are ascertained, to seek leave to join them to the instant action.  Thus, without

limitation, unknown "John Doe" Defendants 1-10 include, in addition to the above, other

individuals, including, but not limited to, CB&I officers and employees who were fiduciaries of

the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the

Class Period.

**THE PLANS**

35.     Both Plans are defined contribution retirement plans within the meaning of

ERISA.  The Plans are intended to be retirement plans.

36.                              Redacted                              *See* CB&I000411.

37.     The Plan document as amended and restated as of January 1, 2013 (the "2013

Plan Document"), provides that " 'Company Stock' means the publicly traded common shares of

the Company's parent corporation, Chicago Bridge & Iron Company N.V., a Netherlands corporation." CB&I000009. Further, "'Company Stock Fund' means an Investment Fund designated for investment in Company Stock. Up to one hundred percent (100%) of the assets of the Company Stock Fund may be invested in Company Stock." *Id.* Similar statements are made in the 2014 Plan Document and the Plan document as amended and restated as of January 1, 2016 (the "2016 Plan Document"). CB&I000103, 200.

38.     The 2013 Plan Document also provides, in part:

> 6.07 <u>Investment Funds</u>. The assets of the Trust Fund shall be invested in the Investment Funds authorized by the Investment Committee for the investment of Participants' Accounts. The Investment Committee may, from time to time, authorize additional Investment Funds with such investment characteristics, as it deems appropriate. ***The Investment Committee may also terminate the use of any Investment Fund by this Plan as it deems appropriate.*** The Trustee, Investment Manager, or the manager of any Investment Fund, may modify the investment characteristics of any Investment Fund as it deems appropriate. The designation, modification or termination of any Investment Fund shall be reflected in the records of the Plan and shall be communicated promptly to the Plan Administrator. ***Subject to the provisions of Section 6.08, up to one hundred percent (100%) of a Participant's Accounts may be invested in the Company Stock Fund.***

CB&I000047. Similar statements are made in the 2014 Plan Document and 2016 Plan Document CB&I000143, 240.

39.      Notably per the 2013 Plan Document's language, the term "Investment Fund" includes :

> 2.32 ***"Investment Fund"*** means each pooled or commingled investment fund or investment arrangement designated or authorized by the Investment Committee pursuant to Section 6.07 from among (i) regulated investment companies registered under the Investment Company Act of 1940; (ii) common trust funds or collective investment funds qualified under Sections 401 and 501 of the Code; (iii) a discount brokerage account provided by a brokerage firm that is a member of NASD/SIPC designated or

13

authorized by the Investment Committee to provide individually directed accounts for purposes of this Plan; (iv) any other funding vehicle (including, but not limited to, a limited partnership); *(v) the Company Stock Fund;* (vi) any other fund for the holding of other Employer Stock maintained in connection with an Inactive Account transferred from a Transferor Plan, and (vii) for former participants in the Hourly Plan, guaranteed investment contracts issued by Principal Mutual Life Insurance Company. Solely for the purpose of segregating notes representing loans to a Participant under Section 7.02, the Trustee and Plan Administrator shall hold such notes as a separate Investment Fund pursuant to Section 7.02(f).

CB&I000017. Similar statements are made in the 2014 Plan Document and the 2016 Plan Document. CB&I000111, 208.

> 40.    According to the 2013 Plan Document:
>
>> (b) Company Stock. Notwithstanding the foregoing, if the Company in its sole discretion makes Company Contributions or Matching Contributions in part or in whole in the form of Company Stock, such Company Stock shall be initially contributed to the Company Stock Fund. A Participant may, in accordance with such rules and procedures as the Plan Administrator may establish or adopt, direct the investment of Elective Deferrals and Rollover Contributions, and Matching Contributions and Company Contributions made in cash, into the Company Stock Fund. A Participant may not elect to transfer into the Company Stock Fund any portion of his or her Accounts that are invested in another Investment Fund. However, a Participant may elect to transfer all or a portion of his or her Accounts that are invested in the Company Stock Fund into another Investment Fund in accordance with such rules and procedures as the Plan Administrator may establish or adopt. Cash dividends and other cash distributions received with respect to the portion of a Participant's or Beneficiary's Accounts invested in the Company Stock Fund shall be retained in the Company Stock Fund and reinvested in Company Stock.
>>
>> To the extent provided in Code section 401(a)(35), Treas. Reg. section 1.401(a)(35)-1 and any superseding guidance, an applicable individual may elect to direct the Plan to divest any publicly traded employer securities held in the applicable portion of his or her Account and to reinvest an equivalent amount in other investment options offered under the Plan. This diversification right only applies to publicly traded employer securities that are

held in the Account for which the individual meets the definition
of applicable individual.

CB&I000048.

41.     Therefore, pursuant to these sections, the Investment Committee had the authority

to remove the Company Stock Fund at least as early as January 2013.

42.     According to the Plan's                    Redacted


                              Redacted




*See* CB&I000411.

43.     According to the 2014 Plan Document:

> (b)  <u>Company Stock</u>.  Notwithstanding  the  foregoing,  if  the
> Company  in  its  sole  discretion  makes  Company  Contributions  or
> Matching  Contributions  in  part  or  in  whole  in  the  form  of
> Company Stock, such Company Stock shall be initially contributed
> to  the  Company  Stock  Fund.  A  Participant  may,  in  accordance
> with  such  rules  and  procedures  as  the  Plan  Administrator  may
> establish or adopt, direct the investment of Elective Deferrals and
> Rollover Contributions, and Matching Contributions and Company
> Contributions  made  in  cash,  into  the  Company  Stock  Fund.  A
> Participant may elect to transfer into the Company Stock Fund any
> portion  of  his  or  her  Accounts  that  are  invested  in  another
> Investment Fund if.
>
>> (i)  immediately  prior  to  the  transfer,  the  balance  of  the
>> Participant's  Accounts  held  in  Company  Stock  does  not
>> exceed 20% of the balance of his entire Plan Accounts; and
>> (ii) the transfer will not cause the balance of the Participant's
>> Accounts  held  in  Company  Stock  to  exceed  20%  of  the
>> balance of his entire Plan Accounts.
>
> A Participant may elect to transfer all or a portion of his or
> her Accounts that are invested in the Company Stock Fund into
> another  Investment  Fund  in  accordance  with  such  rules  and
> procedures as the Plan Administrator may establish or adopt. Cash

dividends and other cash distributions received with respect to the portion of a Participant's or Beneficiary's Accounts invested in the Company Stock Fund shall be retained in the Company Stock Fund and reinvested in Company Stock.

To the extent provided in Code section 401(a)(35), Treas. Reg. section 1.401(a)(35)-1 and any superseding guidance, an applicable individual may elect to direct the Plan to divest any publicly traded employer securities held in the applicable portion of his or her Account and to reinvest an equivalent amount in other investment options offered under the Plan. This diversification right only applies to publicly traded employer securities that are held in the Account for which the individual meets the definition of applicable individual.

CB&I000144.  Similar statements are made in the 2016 Plan Document. CB&I000240-41.

44.                                    Redacted

CB&I000813-14.

45.                                    Redacted

Redacted

CB&I000807-08.

      46.    According to the Plan's        Redacted

:

Redacted

*See* CB&I000420.

      47.    According to the Investment Committee's November 24, 2014 meeting minutes:

      Redacted

CB&I000810.

      48.    According to the Plan's        Redacted

:

Redacted

*See* CB&I000429.

49.                                 Redacted

                                                    CB&I000668-669.

50.      According to the 2016 11-K:

*General*—The Plan is a defined contribution plan in which certain employees of Chicago Bridge & Iron Company ("CB&I") and certain related companies (collectively, the "Company") are eligible to participate immediately upon hire. On February 13, 2013, CB&I acquired The Shaw Group Inc. ("Shaw"); however, individuals employed by the acquired Shaw entities were not eligible to participate in the Plan through December 31, 2015.

The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). T. Rowe Price Trust Company (the "Trustee") and T. Rowe Price Retirement Plan Services, Inc. served as trustee and record keeper, respectively, for the Plan through December 31, 2015. As more fully described in Note 9, effective January 1, 2016, Bank of America N.A. ("BofA") and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S") became the trustee and record keeper of the Plan, respectively.

*Participant and Company Contributions*—Contributions to the Plan are comprised of employee 401(k) voluntary pre-tax salary deferrals, employee voluntary after-tax Roth contributions, Company 401(k) safe harbor matching contributions and annual Company contributions. Company contributions are discretionary and participant eligibility can be constrained by union agreement, Company subsidiary or service.

•*Participant Contributions*—Participants may contribute amounts on a pre-tax deferred basis or an after-tax Roth basis up to a maximum of 75% of eligible compensation subject to the lower of dollar limits set by the Internal Revenue Service (the "IRS") or percentage limits set by the Company in advance of a given Plan year. Participants may elect to change their contribution percentages at any time.

•*Company Matching Contributions*—The Company contributes safe harbor matching contributions totaling 100% of the first 3% and 50% of the next 2% of employee voluntary contributions. New employees must complete

one year of service to be eligible to participate in the Plan with respect to Matching Contributions.

• *Annual Company Contributions*—The Company may elect, at its sole discretion, to make a Company Contribution for eligible participants (as defined below) each Plan year. To be eligible to receive a Company Contribution, a participant must: (i) be employed with the Company as of the last day of the Plan year, and (ii) must complete one year of service. The amount of the Company Contribution is determined as a uniform percentage of compensation and is allocated to each eligible participant following the end of the Plan year for which the contribution was made. For 2015 and 2014, the Company elected not to make a Company Contribution.

*Participant Accounts*—Individual accounts are maintained for each Plan participant. Participant and Company contributions are allocated to investments within each participant account based upon participant-directed percentages. Investment earnings of funds are allocated to participant accounts based upon the participant's relative percentage ownership of the total applicable fund. The benefit to which a participant is entitled is the benefit that can be provided from the vested portion of a participant's account (see "Vesting" section below).

*Investment Options*—Participants may direct the investment of their account balances into any or all of a number of investment options offered by the Plan, which include: (i) mutual funds investing in equities and bonds, including certain mutual funds beyond the Trustee's family of funds, (ii) a stock fund, which invests in the common stock of Chicago Bridge & Iron Company N.V. ("CB&I N.V."), CB&I's parent [the "Company Stock Fund"], and (iii) common collective trust funds. Participants may transfer account balances among investment options; however, transfers cannot cause the Participant's account balance held in the CB&I N.V. stock fund to exceed 20% of the Participant's entire account balance.

*Vesting*—Participant contributions and all earnings on those contributions vest immediately. Company matching contributions made to the Plan prior to January 1, 2014, vest after three years of service with the Company. Company matching contributions made on or after January 1, 2014 vest immediately. If the Company elects to make an annual Company contribution, those contributions will vest after three years of service with the Company. Participants who reach age 65 or who terminate their

participation in the Plan due to death, disability, retirement, or a reduction-in-force termination, are granted full vesting in Company matching and annual Company contributions.

51.     At year-end 2013, close to the start of the Class Period, the Plan held $57,473,328 in CB&I Stock, and at year-end 2015, the latest publicly available data, the Plan held $26,027,612 in CB&I Stock.

52.     The 2016 11-K discloses that: "Prior to January 1, 2014, interfund transfers to the CB&I N.V. stock fund from other investment options were not permissible under the Plan. Effective January 1, 2014, the Plan was amended and restated to allow Participants to transfer a portion their account balance into the CB&I N.V. stock fund. However, the transfer must not cause the balance of the Participant's accounts held in the CB&I N.V. stock fund to exceed 20% of the Participant's entire account balance."

53.                              Redacted

CB&I000763-64.

54.                              Redacted

CB&I000772.  Further:

                              Redacted

Redacted

*Id.*

55.     A Summary Material Modification of the Chicago Bridge & Iron Savings Plan,

from the Plan Administrator to all eligible employees of the Plan, dated May 1, 2017, provides,

in part:

> Effective May 1, 2017, new investments in the CB&I Stock Fund
> are not permitted and no amounts may be transferred from any
> other investment fund into the CB&I Stock Fund. If you currently
> invest a portion of your account in the CB&I Stock Fund, you may
> continue to hold such investment; however, if you sell all or part of
> your investment in the CB&I Stock Fund on or after May 1, 2017,
> you will not be permitted to reinvest such amounts in the CB&I
> Stock Fund thereafter.

CB&I000286.

56.                                     Redacted

CB&I000789-90.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action derivatively on the Plans' behalf pursuant to ERISA

§§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and as a class action pursuant to Rules 23(a),

(b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plans, Plaintiff, and

the following class of similarly situated persons (the "Class"):

> All persons, except Defendants and their immediate family
> members, who were participants in or beneficiaries of the Plans at

any time from October 29, 2013, through the present,[4] and whose Plans accounts included investments in Company Stock.

58.     Given ERISA's distinctive representative capacity and remedial provisions, courts have observed that ERISA litigation of this nature presents a paradigmatic example of a FED. R. CIV. P. 23(b)(1) class action.

59.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are at least thousands of members of the Class. For example, the Plan's 2015 Form 5500 Annual Return/Report of Employee Benefit Plan shows that there were 8,790 Participants at the start of 2015.

60.     At least one common question of law or fact exists as to Plaintiff and all members of the Class, which common question will resolve an issue that is central to the validity of each Class member's claims in one stroke.  Multiple such questions of law and fact common to the Class exist, including, but not limited to:

        (a)     whether Defendants each owed a fiduciary duty to the Plans, Plaintiff, and members of the Class;

        (b)     whether Defendants breached their fiduciary duties to the Plans, Plaintiff, and members of the Class by failing to act prudently and solely in the interests of the Plans and the Plans' participants and beneficiaries;

        (c)     whether Defendants violated ERISA; and

---

[4] Plaintiff reserves its right to modify the Class Period definition in the event further investigation/discovery reveals a more appropriate time period during which CB&I Stock constituted an imprudent investment option for the Plan.

(d)        whether the Plans, Plaintiff, and members of the Class have sustained damages and, if so, what is the proper measure of damages.

61.    Plaintiff's claims are typical of the claims of the members of the Class because the Plans, Plaintiff, and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of ERISA as complained of herein.

62.    Plaintiff will fairly and adequately protect the interests of the Plans and members of the Class because he has no interests antagonistic to or in conflict with those of the Plans or the Class.  In addition, Plaintiff has retained counsel competent and experienced in class action litigation, complex litigation, and ERISA litigation.

63.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the action, or substantially impair or impede their ability to protect their interests.

64.    Class action status is also warranted under the other subsections of Rule 23(b)(1)(A) and (b)(2) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## FACTS BEARING UPON DEFENDANTS' FIDUCIARY BREACHES
### BACKGROUND

65.    On July 30, 2012, *The Wall Street Journal* reported that CB&I would buy Shaw for $3 billion.  *The Wall Street Journal* article quoted CB&I Chief Executive Officer ("CEO")

Philip K. Asherman described the Shaw transaction as "as an attractive 'bolt on' acquisition that will give CB&I, which is more focused on the oil-and-gas-business, better access to lucrative and potentially growing projects in the electric-power industry[,]" including the Nuclear Projects.

66.     The November 19, 2012, Definitive Prospectus asking shareholders of both companies to approve the transaction states that "CB&I currently anticipates that the Transaction will be accretive to earnings per share in the first full year following the completion of the Transaction."   The Definitive Prospectus also discussed "Shaw's nuclear contracts and the substantial due diligence that had been done in regards to such contracts."

67.     The Definitive Prospectus  further stated:

> CB&I management noted that, as result of the due diligence review of these contracts, CB&I had concluded that the contracts were well structured from the perspective of protecting Shaw (and thus CB&I post-Transaction) in the event of overruns, increased input costs, or performance delays or customer dissatisfaction. Finally, CB&I management also provided and the CB&I Supervisory Board discussed additional information on the strategic rationale for combining the two companies, including, among others, (i) the belief that the combined company would be one of the most complete energy infrastructure-focused companies in the world, (ii) that global energy infrastructure-related capital spending continued to increase, (iii) that the Transaction would allow CB&I to extend Shaw's capabilities to CB&I's customers globally, (iv) that, after the Transaction, CB&I business would be more broadly distributed across the overall energy sector with a wider range of stable, reimbursable services and (v) the potential cost savings and revenue synergies.

68.     As *The Motley Fool* reported in a March 9, 2015 article entitled "The Chicago Bridge and Iron Merger with Shaw: A Marriage of Unequals"

> . . . despite all the talk of synergies, Shaw and CBI were worlds apart, as different as they come in the EPC (engineering, procurement, and construction) sector. CBI is one of the leading companies in that field. Shaw by contrast was a hodgepodge mix of substandard companies clobbered [sic] together by an ambitious management; to top it off, it was saddled by a portfolio of money-losing nuclear contracts.

Not surprisingly, the market soon realized the wrongness of this marriage and halved the stock price back to where it stood before the vows were exchanged. Since Shaw is now half of CBI, to understand if CBI is a good investment today, we must dig deeper into Shaw.

**Who exactly is this Shaw, and how bad is she?**

Shaw began life in 1987 as a small but ambitious pipe fabricator. It only entered the EPC field in 2000 when it acquired the assets and unfortunately also the liabilities of the then-bankrupt Stone & Webster, once a leading name in the EPC sector.

With this acquisition, Shaw entered the big time. Its revenues grew to $1.5 billion in 2001, then broke $3 billion the following year. But beneath the spectacular growth, Shaw was struggling to adjust to the EPC business, and the contracts it inherited from Stone were no help at all.

The EPC business is unique in many ways, and to understand Shaw and CBI, we need at least a basic understanding of this rather obscure sector.

Contracts in this sector range from, on the one hand, the fixed-price contract, in which cost savings and cost overruns go to the contractor, to the cost-reimbursable contract, in which the contractor simply passes along the costs to the contractee and earns a pre-established margin. A lot of contracts are neither one nor the other, but somewhere in between; fixed-priced contracts can have a cost-reimbursable component and vice versa.

To survive in this field, one must be technologically competent, but above all, one must know how to manage risk. An EPC company is half fabricator/manufacturer, half insurance company. When it signs a fixed-price contract, for instance, the contractor is, in effect, selling the contractee insurance. In return for a higher contract price -- a sort of premium -- it accepts the risk of cost overruns, which can be quite staggering, as we will see.

Surviving in this sector is no easy task, and Shaw from the beginning was ill-equipped for the challenge. To cover its weaknesses, Shaw relied on its accounting skills, that is to say, on its ability to mask reality. Since CBI later would resort to similar measures, it behooves us to dig a little deeper into this unfortunate episode.

**The shenanigans of Shaw**

An acquisition gives the unscrupulous buyer a prime opportunity to obscure reality. One way to do this is to book a large liability, a reserve, under a name like "accrued contract losses" or "fair value reserve," and then gradually release that reserve over time as management sees fit.

Typically when a reserve is booked, it's done through the income statement -- the loss reserves of an insurance company, for instance, are created by an expense, usually the biggest expense, on its income statement. When a company is acquired, however, the liability is simply consolidated without ever being expensed, and then it's released over time as management sees fit.

Not only did Shaw book a reserve, it made good use of the one-year "measurement period" that is allowed under U.S. GAAP. In 2000, it started with a reserve of $119 million, of which it released $13.5 million that same year, bringing the reserve down to $106 million. In 2001 -- the sharpest cut of all -- it released $99 million in reserves and then simultaneously replenished them by $43 million. Because it was still within the measurement period, Shaw could add the $43 million to its reserves not by expensing through the income statement, but by adding to goodwill as a reevaluation of previous estimates.

But accounting magic could not hide the fact that Shaw had overextended itself. It was a mere pipe manufacturer, after all, which had acquired itself into the EPC business. It had no real experience running a major project, nor in managing risk on a grand scale.

In 2003, telltale signs of trouble appeared. Shaw released $42 million in reserves that year as a reduction to cost of revenues. Since it reported about $32.6 million of income before taxes, in reality it had lost about $9 million at best -- and not earned $20 million as it reported. Operating cash flow came in at a staggering minus $200 million. Not surprisingly, the stock fell from a high of $63 in 2001 to a low of $8.9 in 2003.

These conditions made it impossible for Shaw to pay off the debt it had incurred for its acquisitions. As the principal came due, it had no choice but to issue stock. Between 2004 and 2005, its share count went from 43 million to 84 million. When the dust settled, about 47% of the company had been sold for about $500 million, a staggering level of dilution by any measure.

26

**Shaw's Vietnam**

But if Shaw was a clumsy operator, it was an excellent visionary, always ready with a new vision to replace the old one that had just failed. When it acquired Stone & Webster back in 2000, it was the mighty possibility of the U.S. power market that justified the move. When this went sour (remember Enron?), it was the environmental and infrastructure sector that was supposed to be so promising. In 2007, it was the nuclear sector's turn to be graced by Shaw's presence.

Nuclear, despite its promise, is a tough business, not so much because of competition, but because of the general difficulty of the projects, their long completion times, and the political/regulatory risks.

Into this field, Shaw jumped, and in 2008, it finally got its wish. It signed contracts to build nuclear reactors, two each, in Georgia and South Carolina. It was the first such project since Three Mile Island and a big deal for a company which had only entered the EPC field in 2000.

Then came the troubles. Permit delays and operational setbacks led to cost overruns. The nuclear projects became Shaw's Vietnam, and I am convinced that had the gallant CBI not come to the rescue with a $3.3 billion offer (very rich by any measure), Shaw would not have survived this quagmire. Now Shaw's problems have become CBI's problems, and much of CBI's recent travails are due to the mounting losses from Shaw's ambitious projects.

**Is CBI cheap?**

In 2013, after acquiring Shaw, CBI reported its highest net income *ever* in its long, century-old life: $454 million. (It has since been surpassed by the 2014 earnings figure.) It also reported its lowest operating cash flow *ever* -- a negative $112 million.

Why this difference between income and cash flow? A couple reasons: First, there are the reserves. It is difficult to say exactly how much CBI booked because the figure is embedded in an account called "billings over costs and earnings" -- similar to deferred revenue. The release of these reserves would certainly account for at least part of the disparity between operating cash flow and net income.

The other reason is quite simply because the cost overruns related to the Shaw projects are not being recognized as losses. According to CBI, those are not really losses because contractually, they are

entitled to be reimbursed for them, both by the owner and, if not by the owner, then by their partner, Westinghouse Electric. In the meantime, costs are being incurred and cash is flowing out, while non-cash earnings are being booked as assets.

This kind of accounting is far from conservative -- the cookie jar reserves especially are inexcusable -- but when it comes to the recognition of losses, one must remember that CBI is in the middle of legal disputes with both the contractees and Westinghouse; and it is difficult to lay a claim to money that is being simultaneously written off in one's own reports. Doing this may be conservative accounting but it would weaken CB&I's argument and boost the morale of its legal foes.

69.     Mr. Asherman and CB&I repeatedly offered guidance that the Nuclear Projects would have minimal, if any, impact on the Company, including on a July 30, 2012 analyst and investor call and at a Credit Suisse conference in June of 2013.

## CB&I STOCK WAS ARTIFICIALLY INFLATED

70.     During the Class Period, CB&I and certain of its management caused CB&I Stock to be artificially inflated by misrepresenting the progress and quality of the Nuclear Projects and the effect thereof on CB&I's profitability.  Indeed, CBI did not recognize any impairment to goodwill on the Nuclear Projects while the Company still owned them, but it later admitted it would have to take an impairment and other noncash charges totaling over $1 billion when CBI sold the Nuclear Projects.

71.     On October 30, 2013, the Company disclosed in a Form 10-Q that:

Goodwill is not amortized to earnings, but instead is reviewed for impairment at least annually, absent any indicators of impairment. We perform our annual impairment assessment during the fourth quarter of each year based upon balances as of the beginning of that year's fourth quarter. As part of our annual impairment assessment in the fourth quarter of 2012, we performed a qualitative assessment of goodwill to determine whether it was more likely than not that the fair value of a reporting unit was less than its carrying value. Based upon this qualitative assessment, a two-phase quantitative assessment was not required to be performed for any of our reporting units. If, based on future

qualitative assessments, the two-phase quantitative assessment is deemed necessary, the first phase would screen for impairment, while the second phase, if necessary, would measure impairment. If required, the implied fair value of a reporting unit would be derived by estimating the unit's discounted future cash flows. During the nine months ended September 30, 2013, ***no indicators of goodwill impairment were identified.***

\* \* \*

. . . The $725.9 million net change in our accounts receivable, accounts payable and net contracts in progress balances was due to progress on the nuclear projects (approximately $455.0 million), working capital requirements and timing of collections and payments for our large cost-reimbursable projects (approximately $135.0 million), and timing of collections and payments on our large fixed-price projects (approximately $30.0 million). The decrease in accrued and other non-current liabilities was primarily due to the payment of acquisition-related costs and annual incentive plan and savings plan obligations, primarily during the first quarter.

Emphasis added.  Similar disclosures were made throughout the class period (with the balances

fluctuating).

72.     CB&I's October 30, 2013 Form 10-Q also stated "[o]f the $2,826,450[,000] of

estimated total goodwill recorded in conjunction with the Shaw Acquisition,

approximately $44,200[,000] is deductible for tax purposes." This was a sizable increase from

the Company's prior quarter Form 10-Q, filed July 31, 2013, which noted "[t]he excess of the

purchase price over the preliminary estimated fair value of the net tangible and identifiable

intangible assets acquired totaling $2,446,701[,000], was recorded as goodwill."

73.     CB&I's February 27, 2014 Form 10-K stated that:

The $815.5 million net change in our Contract Capital balances was due primarily to progress on the nuclear projects (approximately $540.0 million) and working capital requirements and timing of collections and payments for our large cost-reimbursable projects (approximately $270.0 million).

74.     CB&I's February 27, 2014 Form 10-K also stated "[o]f the $3,296,530[,000] total goodwill recorded in conjunction with the Shaw Acquisition, approximately $44,200[,000] is deductible for tax purposes and is associated with the remaining portion of goodwill previously deductible by Shaw."   The goodwill provision associated with Shaw had thus increased by approximately 17.5% in one quarter, and it stood in excess of the amount paid for Shaw less cash acquired in the transaction. CB&I's goodwill was impaired by this time, and should have been written down, because its reported carrying value was higher than the $ 2,202,143,000, net of unrestricted cash acquired, that CB&I paid for Shaw.

75.     CB&I's February 27, 2014 Form 10-K also noted that "[s]ignificant changes in our purchase price allocation since our initial preliminary estimates reported in the first quarter 2013 were primarily related to $1,117,420 of fair value adjustments associated with our acquired contracts, $41,051 of increases in the fair value of property and equipment, $240,072 of associated net adjustments to deferred taxes, and $58,300 of increases in the fair value of intangible assets."   As a result of these adjustments, the liability for contracts in progress, net, increased significantly to $2.3 billion as of February 13, 2014, while Goodwill increased 35%, from $2.4 billion to $3.3 billion, both as of the same date. These were recorded as retroactive purchase price adjustments even though the price CB&I paid for Shaw, and the assets and liabilities that CB&I acquired, were fixed at the time of the transaction. All that changed was expected costs of the Nuclear Projects, which should have been booked under operating results not through retroactive purchase price adjustments.

76.     On April 23, 2014, CB&I CEO Asherman described the Company's revenue and earnings as "solid" in a press release despite being inflated by improper accounting for the Shaw acquisition.

77.     By using purchase price adjustments, CB&I transferred what would have been $1.2 billion (pretax) of expenses and losses into goodwill, which did not affect earnings.

78.     In its 2014 Form 10-K, filed February 25, 2015, more than two years after CBI completed its acquisition of Shaw, CB&I disclosed for the first time the composition of contracts in progress, preventing the market from understanding the enormous gross values of the contracts in progress acquired from Shaw, which were actually in the tens of billions of dollars.

79.     Upon information and belief, CB&I effectively manipulated the purchase price of the Shaw acquisition to act as a "cookie jar" reserve to make the acquisition appear short of the disaster that it was.

80.     On June 11, 2014, *SNL Electric Utility Report* reported in an article entitled "Moody's: Slowdown in nuclear renaissance increases litigation risks" that:

> The Nuclear Regulatory Commission has accused CB&I of violating regulations by falsifying test results. In response, the company is working to improve its "nuclear safety culture" at the facility.
>
> Problems with the contractors building the new reactors - a consortium led by CB&I and Westinghouse - have already been linked to potentially hundreds of millions of cost overruns for the project.
>
> Georgia Power said it will not accept certain components for use at its proposed Vogtle nuclear reactors until it can verify their quality. While it has seen "significant improvements" at the facility since the stop work order was placed in 2013, Georgia Power officials said the order will remain in effect. Georgia Power owns 45.7% of the roughly $15 billion project.
>
> The original impetus for the stop work order in January 2013 was that Georgia Power had issues with the quality of components coming out of the facility and other CB&I suppliers, the company said. In March, Georgia Power lifted the order for CB&I suppliers besides the Lake Charles facility but kept requiring "real-time oversight" until "the Lake Charles facility has demonstrated its ability to fabricate modules in compliance with licensing and

quality requirements," according to a September 2013 filing with the PSC.

At the hearing, company representatives said in response to questioning from the PSC that the order is needed for the company to ensure that the new reactors are built "to the highest level of quality."

Problems with the producing structures for the project's nuclear island, the foundation for the reactors, have already contributed to the project being delayed by a year. Georgia Power also said last year that its share of the project would cost $600 million more than it previously estimated, up to $6.85 billion.

In addition, Georgia Power's parent, Southern Co., is in a legal dispute with the contractors over which party is at fault for delays. About $900 million is at stake in the lawsuits that the parties have filed against each other.

* * *

The NRC has said its investigations have found that in 2010, before the Lake Charles facility was acquired by CB&I, employees there falsified welder qualification tests, leading to a lack of "reasonable assurance that safety-related welding processes would be controlled and accomplished by qualified personnel in accordance with applicable codes and standards," according to a February letter. The violations were preliminary, and the NRC staff is still working on finalizing them, according to NRC spokesman Roger Hannah.

81.      From June 10 to 12, 2014, in response to information becoming public concerning CB&I and the associated cost overruns and delays at the Nuclear Projects, the price of CB&I's stock decreased from $83.30 per share to $76.72 per share, or almost 8%, on higher than average trading volume.

82.      On June 17, 2014, *SeekingAlpha.com* reported in an article entitled "Chicago Bridge & Iron: Acquisition Accounting Shenanigans Dramatically Inflate Profitability - Prescience Point Initiates At Strong Sell" that:

• CB&I has used creative acquisition accounting to create a $1.56B loss reserve that can be converted directly into gross profit to offset costs, thereby dramatically inflating reported profitability.

• CB&I is struggling with certain Shaw contracts that may prove to be severely loss making; the reserve is being used to mask their impacts and CB&I's increasingly fragile financial condition.

• Q1'2014 results confirm our expectations that CB&I continues to face headwinds, including continued losses, divergence of earnings and cash flow, and a rising dependency on debt.

• We believe CB&I will be forced into a goodwill write-down or financial restatement, either of which would trigger debt default, heightening the risk of liquidity crisis or dilutive equity raise.

• CBI reporting inflated profitability has resulted in a stock price inflated beyond reasonable measure. Based on our analysis, CB&I stock is worth ~$37 per share, 49% below current trading levels.

83.    CB&I's stock closed at $68.26/share on June 17, 2014, after having opened at $73.45/share.

84.    On July 24, 2014, the Company disclosed in a Form 10-Q:

*Operating Activities*—During the first six months of 2014, net cash used in operating activities was $374.4 million, primarily resulting from cash generated from earnings, offset by the net change in our accounts receivable, inventory, accounts payable and net contracts in progress account balances (collectively "Contract Capital") ($811.3 million, combined). Our contracts in progress balances represent our cash position relative to revenue recognized on projects, with (i) costs and estimated earnings in excess of billings representing an asset reflective of future cash receipts, and (ii) billings in excess of costs and estimated earnings representing a liability reflective of future cash expenditures and non-cash earnings.

* * *

Fluctuations in our Contract Capital balance, and its components, is not unusual in our business and is impacted by the size of our projects and changing mix of cost-reimbursable versus fixed-price backlog. Our cost-reimbursable projects tend to have a greater working capital requirement ("cost and estimated earnings in excess of billings"), while our fixed-price projects are generally

structured to be cash flow positive ("billings in excess of costs and estimated earnings"). Our Contract Capital is particularly impacted by the timing of new awards and related payments in advance of performing work, and the achievement of billing milestones on backlog as we complete certain phases of work. Contract Capital is also impacted at period-end by the timing of accounts receivable collections and accounts payable payments for our large projects.

The $811.3 million decline in our Contract Capital liability for the first six months of 2014 was primarily due to progress on our two large U.S. nuclear power projects, with the remaining change due primarily to working capital requirements and the timing of receivable collections and accounts payable payments for several large projects in our Engineering, Construction and Maintenance and Fabrication Services operating groups. The Contract Capital liability for the two nuclear projects, exclusive of the margin fair value liability discussed above, was approximately $800.0 million and $1.2 billion at June 30, 2014 and December 31, 2013, respectively, representing a decline of approximately $434.0 million during the period. The Acquisition Closing Date Contract Capital liability, exclusive of the margin fair value liability, was related to significant advance payments received on the projects prior to the Acquisition and fair value adjustments related to cost to complete the projects. This Contract Capital position has been impacted by the partial utilization of the pre-acquisition advance payments and timing of achievement of subsequent billing milestones. This balance will continue to fluctuate prospectively based on the timing of future billings and collections and will ultimately decline as the projects progress. Although we anticipate additional decline for the nuclear power projects during the remainder of 2014, we expect the decline to be more than offset in the back half of the year by Contract Capital improvement from advance payments on our recent large awards and anticipated future awards, and improvement in our Contract Capital position from certain projects in our backlog. We expect this improvement, combined with cash generated from earnings, to result in overall positive operating cash flows for the back half of the year. Further, we believe our anticipated future operating cash flows and capacity under our revolving and other credit facilities will be sufficient to finance our capital expenditures, settle our commitments and contingencies and address our working capital needs for the foreseeable future.

85.    The July 24, 2014 Form 10-Q disclosed that the Company had "$3.3 billion [in goodwill] associated with the 2013 Shaw Acquisition."

86.     As a result of the July 24, 2014 disclosure, which was made after markets closed, the Company's stock price fell to $63.07 from the prior day's closing price of $69.48, on unusually high volume, as questions arose about Prescience Point's concerns and as CB&I management failed to surely address the same on its earnings call.

87.     On October 1, 2014, *The Acadiana Advocate* (Lafayette, LA) reported in an article entitled "Nuclear plant parts supplier agrees to changes at Louisiana factory" that:

> Chicago Bridge & Iron Co. agreed in a settlement with the U.S. Nuclear Regulatory Commission to strengthen its warnings against misconduct for workers at the plant. At the time of the infractions, the Lake Charles plant was owned by The Shaw Group in Baton Rouge. CBI acquired Shaw in February 2013.
>
> CBI must also watch for misconduct as part of existing oversight programs.
>
> CBI's factory makes parts for nuclear plants under construction in Georgia and South Carolina. The firms building and designing those plants are shifting production work away from CBI's Lake Charles facility because utility executives and analysts said it struggled to meet NRC quality rules and produce key components on time. NRC officials said the cheating did not cause any defective parts to leave the factory.
>
> CBI spokeswoman Gentry Brann did not return messages seeking comment Tuesday and Wednesday.
>
> The agreement was struck last week during negotiations between CBI and federal regulators.
>
> "The NRC pursued the mediation process with Chicago Bridge & Iron because we were able to get commitments for a broader range of corrective actions from the company in addressing the underlying issues," Patricia Holahan, acting director of NRC's Office of Enforcement, said in a statement.
>
> Federal officials have accused three factory employees of cheating on a welding test in April 2010, according to NRC documents summarizing the probe. Investigators accuse one welder of cheating by taking a qualification test for a co-worker. A test administrator allowed the test even though authorities said the

administrator was aware of the misconduct. The names of the workers have not been released.

88.   On October 2, 2014, *The State* (Columbia, South Carolina) reported in an article entitled "Contractors say it will cost $1 billion more to finish new nuclear reactors at V.C. Summer" that:

> The contractors building two new reactors at SCE&G's V.C. Summer nuclear plant in Fairfield County said Thursday it would cost an additional $1.2 billion to finish the work there.

> However, SCE&G indicated they have not agreed to the consortium's new cost estimates nor any projected new completion dates.

> Cayce-based SCANA Corp., the parent company of the electric utility, released a statement Thursday afternoon saying its construction and design consortium, primarily Chicago Bridge & Iron Co. and Westinghouse, informed them the increased preliminary cost estimates are needed to support project delays announced in August associated with engineering problems, fabrication and procurement of components and construction issues.

> SCE&G, which owns 55 percent of the new two-reactor project, would be charged an additional $660 million to reach completion of the project, and Santee Cooper, which owns the remaining 45 percent, would be charged an additional $540 million to cover completion costs, SCANA said.

> The CB&I and Westinghouse consortium told SCANA in August they were undertaking a full re-baselining of the V.C. Summer plant's Unit 2 and Unit 3 new reactors due to projected delays that would move completion of the Unit 2 reactor back to late 2018 or early 2019 and Unit 3's completion back a year beyond that to at least late 2019.

> The $1.2 billion revised cost estimate issued by the engineering and construction consortium Thursday is in 2007 dollars, SCANA's announcement said, "and would be subject to escalation."

> "It also excludes any owner's cost amounts associated with the delays, which amounts could be significant," the SCANA statement read. "The consortium's preliminary schedule and the

> cost estimate information are under review by SCE&G and Santee Cooper, and it is anticipated that further study, evaluation and negotiations will occur," SCANA said.
>
> The two new reactors at Summer initially were supposed to cost $9.8 billion, which SCE&G has been allowed to begin collecting from ratepayers prior to power generation under the state Base Load Review Act. Charging customers up front is projected to cut finance costs of the project, ultimately costing ratepayers less.
>
> If the increased costs are to be added to the total cost of the reactor, SCE&G and the consortium will have to negotiate whose responsibility those increased costs fall to—SCE&G and its ratepayers or the consortium, which has had multiple delays with fabrication and delivery.

89.     Between October 1, 2014, and October 10, 2014, as the market digested this firm-specific information regarding past and ongoing problems at the Nuclear Projects, the Company's stock price dropped from more than $57.70 per share to $49.38 per share.

90.     On October 24, 2014, the Company disclosed in a Form 10-Q that there was still a "$3.3 billion [goodwill balance] associated with the 2013 Shaw Acquisition" and that:

> The $1.1 billion decline in our Contract Capital liability for the first nine months of 2014 was primarily due to progress on our two large U.S. nuclear projects, with the remaining change due primarily to working capital requirements and the timing of receivable collections and accounts payable payments for several large projects in our Engineering, Construction and Maintenance and Fabrication Services operating groups.

91.     On November 21, 2014, Steven Roetger, an analyst at the Georgia Public Service Commission ("GPSC"), and William R. Jacobs, Vogtle's project manager and an expert in the construction, startup and operation of nuclear power plants for GDS Associates, Inc., provided testimony to the GPSC regarding delays to the Vogtle plant and the intention to "hold the consortium accountable" for the schedules proposed.[5]

---

[5] http://www.psc.state.ga.us/factsv2/Docket.aspx?docketNumber=29849

92.     On December 7, 2014, *The Associated Press* reported in an article entitled "State monitor warns on Ga. nuclear plant costs" that:

> ATLANTA (AP) — Public watchdogs are giving Southern Co. a between-the-lines warning that building a multibillion-dollar nuclear plant in Georgia without a detailed construction schedule could trigger financial penalties.
>
> That warning came in a report filed by a nuclear engineer and an analyst who work for state regulators and monitor the construction of two new reactors at Plant Vogtle in eastern Georgia.
>
> The Public Service Commission has warned for at least two years that Southern Co. subsidiary Georgia Power is relying on an outdated project schedule that contains almost no detail after December 2015, even though construction will continue for several more years.
>
> Nuclear engineer William Jacobs Jr. and financial analyst Steven Roetger said building a complex, first-of-its-kind project without a schedule was unreasonable.
>
> "In fact it runs counter to any prudent project management, nuclear or otherwise," goes against the project's construction agreement and an industry group's own recommendations for construction, Jacobs and Roetger wrote in a semi-annual report.
>
> That keyword — "prudent" — was meant to catch the ears of Southern Co. executives.
>
> By law, the Public Service Commission can prevent Georgia Power, a regulated monopoly, from billing its customers for any construction costs the commission decides are the result of "imprudence."
>
> The state's elected utility regulators have agreed to delay any final decisions on construction costs until after the first reactor is finished, likely in late 2017 at the earliest. However, the latest filing shows the commission's staffers are laying the legal groundwork that could be used in future arguments to prevent customers from paying some of Georgia Power's costs.
>
> Georgia Power spokesman Brian Green said utility regulators have not objected to any construction costs so far. Regulators say utility executives are negotiating with Westinghouse Electric Co. and Chicago Bridge and Iron Co. to obtain a firm construction schedule and completion date.

"We feel like we're showing we're executing the project in a prudent way," Green said.

Three nuclear plants are under construction in the United States. Plant Vogtle in Georgia and the V.C. Summer nuclear plant in South Carolina use the same design and builders. In October, the owners of the South Carolina plant announced they faced more than $1 billion in potential costs. Meanwhile, the Tennessee Valley Authority is finishing a reactor at its Watts Bar plant in Tennessee that had been mothballed for years.

Georgia Power owns a 46 percent stake in the new plant. It estimates it will spend $6.7 billion for its share of construction, an increase of $591 million over the original state-approved budget. However, if the two reactors cannot be finished by the end of 2017 and 2018 as planned, costs will rise.

Georgia Power's budget estimate does not reflect the potential costs of resolving a roughly $1 billion lawsuit between the plant's builders and its owners over previous delays and design changes. While Georgia Power has denied any responsibility for those extra costs, company leaders have said they would consider a settlement if it made financial sense.

2.     On December 10, 2014, *Power News* reported in an article entitled "Construction

Monitor: Longer Delays Are Likely for Vogtle Reactors" that:

The two nuclear reactors under construction at Plant Vogtle will be delayed beyond their forecast commercial operation dates of December 2017 and 2018, an oversight team told Georgia regulators in the project's latest construction monitoring report. The consortium building the project had originally projected the first of the two AP1000 reactors would be operational in April 2016. But Dr. William Jacobs, Jr., the Georgia Public Service Commission's (PSC's) independent construction monitor for the Plant Vogtle expansion, and Steven Roetger, who is among the staff involved in providing oversight of the project, now say in the Nov. 21-released report that "it is impossible to determine a reasonable forecast range as to when the units could be commercially available." A complete integrated project schedule (IPS) through the commercial operation date of each unit has not been provided to the oversight staff, the officials said. Meanwhile, Georgia Power Co. has not reaffirmed forecast commercial operation dates, saying only that it is working with contractors Westinghouse and Chicago Bridge & Iron (CB&I) to establish a more "detailed and comprehensive" integrated schedule date.

93.     As the market digested the Public Service Commission testimony, CBI stock dropped drastically, from $57.09 Nov. 21, 2014 to $39.14 on December 12, 2014.

94.     On January 29, 2015, The Southern Company announced Vogtle was delayed by 18 months and there could be an additional $720 million in costs, and Southern repeatedly stated that it believed contractors (including CB&I) are responsible for the costs of delay and mitigation of Vogtle.

95.     The information above failed to disclose that CB&I was responsible for at least hundreds of millions of dollars of liability for overruns and delays related to the Nuclear Projects.

96.     Shortly after filing the 2014 10-K on February 25, 2015, CB&I began to negotiate an exit to the Nuclear Projects and Stone & Webster. As a result of these negotiations, it was clear that the business no longer had any real value and had no reasonable basis to believe that it would receive any meaningful amount of cash for those assets. Instead, the talks centered around a structure similar to a quitclaim, where CBI would be able to walk away from the assets, but would receive little or nothing more in return. As noted above,

> This kind of accounting is far from conservative -- the cookie jar reserves especially are inexcusable -- but when it comes to the recognition of losses, one must remember that CBI is in the middle of legal disputes with both the contractees and Westinghouse; and it is difficult to lay a claim to money that is being simultaneously written off in one's own reports. Doing this may be conservative accounting but it would weaken CBI's argument and boost the morale of its legal foes.

97.     On October 27, 2015, CB&I entered into a purchase agreement (the "Purchase Agreement" or "PA") with a subsidiary of Westinghouse. The purchase price consisted of $0 at closing, subject to (i) a postclosing purchase price adjustment and (ii) potential deferred consideration and earnout payments.  As a result, Westinghouse agreed to accept all liabilities

related to cost overruns at the Nuclear Projects.  At that time, the assets were still booked as goodwill by CB&I.

98.     Pursuant to the Purchase Agreement, on April 28, 2016, Westinghouse delivered CB&I a notice asserting that CB&I owed Westinghouse $2.15 billion in connection with the Nuclear Projects for liabilities "not recorded in accordance with GAAP" and Westinghouse further stated that CB&I should have also booked hundreds of millions of dollars in losses as a reserve liability.

99.     On July 21, 2016, CB&I sued for declaratory judgment to limit potential claims against it under the Purchase Agreement.  *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Company LLC, et al.*, C.A. No. 12585-VCL (Del. Ch. Jun. 21, 2016).  In its complaint, CB&I alleges that its subsidiary, Stone, a contractor, and Westinghouse, a designer of nuclear power plants, were part of a "consortium formed to build the first two nuclear power plants in the United States in more than three decades.  Changes in Westinghouse's design led to delays and multi-billion dollar cost overruns for both parties."  *Id.* at ¶ 1.  CB&I further alleges that "Westinghouse submitted its improper claim [for over $2 billion] only after CB&I submitted its proper calculation of the working capital which would have had *Westinghouse owing CB&I* up to an additional approximately $428 million."  *Id.* at ¶ 4 (emphasis in original).

100.    On July 22, 2016, CB&I Stock fell from $38.41/share to $35.40/share.

101.    In making a September 2, 2016 motion for judgment on the pleadings Westinghouse reserved its rights to bring claims for "actual fraud" related to the Purchase Agreement "in light of information that has surfaced in the course of the post-closing process." *Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Company LLC, et al.*, C.A. No. 12585-VCL, at 13 n.5 (Del. Ch. Sept. 2, 2016).

102.    Vice Chancellor Laster issued an order granting Westinghouse's motion for judgment on the pleadings on December 2, 2016 (the "Order"), and a Memorandum Opinion dismissing CB&I's civil lawsuit against Westinghouse on December 5, 2016 (the "Chancery Court Opinion").  *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Company LLC, et al.*, C.A. No. 12585-VCL (Del. Ch.).   In the Opinion, Vice Chancellor Laster agreed with Westinghouse that under the Purchase Agreement the mandatory path for resolving the parties' disagreements was through an Independent Auditor.  CB&I filed a Notice of Appeal from the Opinion and Order on December 5, 2016 (the "Appeal").

103.    Later that month, on December 27, 2016, in a *DealBook* article entitled "Toshiba Could Lose Billions From Troubled U.S. Nuclear Power Deal," *The New York Times* reported that Toshiba warned that it might need to write off "several billion U.S. dollars" as a result of its subsidiary Westinghouse's purchase of Stone.

104.    On February 12, 2017 *Bloomberg*[6] reported, in part, that:

> At Southern's two new reactors in Georgia — a massive construction site on the edge of the Savannah River — thousands of workers have logged more than 25 million man-hours, yet the project is years behind schedule.
>
> Originally planned to open in 2016 and 2017, they're now slated for 2019 and 2020 — and that may be a stretch. To hit the new targets, Westinghouse would have to accelerate the pace of work to "over three times the amount that has ever been achieved to date," Jacobs, the state's project monitor, told the utility commission last year.
>
> In November, Westinghouse said 33.4 percent of the construction was complete, but a utility supervisor with Southern who asked not to be identified said he's skeptical. The hardest part of the project — the reactor's center — has just started, he said.

---

[6]    https://www.bloomberg.com/news/articles/2017-02-13/toshiba-s-nuclear-reactor-mess-winds-back-to-a-louisiana-swamp

105.    Westinghouse filed for Chapter 11 bankruptcy on March 29, 2017.  According to a March 31, 2017 *Forbes* article entitled "Westinghouse Bankruptcy Shakes the Nuclear World," "[t]he cause of this latest problem seems to have nothing to do with nuclear power and everything to do with incompetent business practices, particularly Toshiba's construction contractor."[7]  In analyzing a Bloomberg article, *Forbes* reported that "the choice of Shaw Group to be the main contractor was foolish and costly blow to the project."

106.    After full briefing on the Appeal, the Supreme Court of the State of Delaware held oral argument on May 3, 2017.  According to a May 3, 2017 *Reuters* article entitled "Westinghouse, CB&I spar in court over $2 billion merger dispute," Chief Justice Strine "pressed the parties several times to explain why the case should not be returned to the lower court for discovery and a possible trial to determine the intent of the parties when they drafted the Shaw sale agreement."[8]

107.    As of June 5, 2017, CB&I's stock was down 40.8% over the prior three months and 40.2% over the prior six months.  The stock has returned -49.7% over the last year,[9] and the Company's market capitalization is less than its potential liabilities as of the filing of this Complaint.

108.    On June 27, 2017, in the Supreme Court Action, Justice Strine issued an opinion, which was revised the following day (the "Supreme Court Opinion"), reversing the Chancery Court Opinion, after finding, among other things: (i) "[t]o resolve their differences, Chicago Bridge agreed to sell Stone to Westinghouse" with a purchase price of zero (Supreme Court

---

[7]    https://www.forbes.com/sites/jamesconca/2017/03/31/westinghouse-bankruptcy-shakes-the-nuclear-world/#2e9e38a42688

[8]  http://www.reuters.com/article/us-toshiba-accounting-westinghouse-cbi-idUSKBN17Z2AF

[9]    *See*    http://news.cmlviz.com/2017/06/05/stock-volatility-risk-alert-chicago-bridge--iron-company-n-v-realized-volatility-hits-a-towering-high.html

Opinion at 1); (ii) "Westinghouse agreed that its sole remedy if Chicago Bridge breached its representations and warranties was to refuse to close, and that Chicago Bridge would have no liability for monetary damages post-closing (the 'Liability Bar'). Furthermore, Westinghouse agreed to indemnify Chicago Bridge for 'all claims or demands against or Liabilities of [Stone].'" (*Id.* at 3); (iii) "[t]hat view of the overall transaction is buttressed by the Westinghouse CEO's apparent description of the transaction as a 'quitclaim.'" (*Id.* at 4); (iv) "[a]s Westinghouse admits, the overwhelming percentage of its claims are based on the proposition that Chicago Bridge's historical financial statements—i.e., the very ones on which Westinghouse could make no post-closing claim—were not based on a proper application of generally accepted accounting principles ("GAAP")." (*Id.*); and (v) "Chicago Bridge filed this action seeking a declaration that Westinghouse's changes based on assertions that Stone's financial statements and accounting methodologies were not GAAP compliant are not appropriate disputes for the Independent Auditor to resolve when those changes are, in essence, claims that Chicago Bridge breached the Purchase Agreement's representations and warranties and therefore are foreclosed by the Liability Bar." *Id.* at 5-6.

109.    After making further findings, the Supreme Court Opinion held that "[t]he Court of Chancery should declare that, under the Purchase Agreement, Westinghouse's arguments based on assertions that Chicago Bridge's historical financial statements and practices did not comply with GAAP may not be heard in proceedings before the Independent Auditor and should enjoin Westinghouse from submitting to the Independent Auditor or continuing to pursue already-submitted claims not based on changes in facts and circumstances between signing and closing." *Id.* at 6.  Therefore, the Supreme Court remanded the case to the Court of Chancery "and direct[ed] it to grant Chicago Bridge's requested declaratory relief." *Id.* at 48.

110.    The day the Court issued the Supreme Court Opinion, CB&I's stock closed at $20.02, up from a close of $14.40 the day prior.

111.    In response to the Supreme Court Order, on August 7, 2017, the Chancery Court granted the Final Order and Judgment which ordered, in part, that:

> a. Westinghouse may not submit claims to the Independent Auditor or continue to pursue already-submitted claims based on arguments that also would have constituted arguments that Chicago Bridge breached the Purchase Agreement's representations and warranties; and
>
> b. Westinghouse may make any argument to the Independent Auditor that addresses a change in facts or circumstances that occurred between signing and closing relevant to the Closing Date Purchase Price. Westinghouse may not submit to the Independent Auditor or continue to pursue already-submitted claims not based on changes in facts and circumstances between signing and closing.

*Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Company LLC, et al.*, C.A. No. 12585-VCL (Del. Ch. Aug. 7, 2017), Final Order and Judgment.

112.    CB&I's stock closed at $16.25 on August 7, 2017, the day the Chancery Court issued the Final Order and Judgment.  However, the stock was trading for under $10 just a little over a week later, after the Company filed a Form 10-Q and Form 8-K with the SEC on August 9, 2016, regarding its financial results for the second quarter ended August 9, 2017, and in a second Form 8-K filed on August 15, 2017, that the Company "would not have been in compliance with the financial covenants" of certain "debt arrangements and instruments."

113.    Among other things, the press release attached as Exhibit 99.1 to the Form 8-K regarding the Company's 2017 second quarter stated:

> Unless otherwise indicated, results reported are for continuing operations, which consist of CB&I's Engineering & Construction (E&C), Fabrication Services and Technology businesses. The results of our former Capital Services business have been classified as a discontinued operation for all periods presented. CB&I also

45

announced in a separate news release today that it is initiating the process to sell its Technology business.

Revenue was $1.3 billion in the second quarter of 2017, compared to revenue of $2.2 billion in the second quarter of 2016. CB&I reported a net loss of $304.1 million, or $3.02 per diluted share, in the second quarter of 2017, compared to net income of $115.6 million, or $1.09 per diluted share, in the second quarter of 2016.

New awards in the second quarter of 2017 totaled $1.1 billion, compared to $1.3 billion in the second quarter of last year. Backlog at June 30, 2017, was $13.6 billion, compared to backlog of $14.7 billion at June 30, 2016.

"Although our second quarter results are disappointing, we are taking decisive actions to improve our operating performance and strengthen the company's financial position," said Patrick K. Mullen, President and Chief Executive Officer of CB&I. "We have initiated a comprehensive cost reduction program and suspended our dividend. We are injecting additional rigor and discipline into our execution and risk management processes, further strengthening the integration between our E&C and Fabrication Services operating groups, and accelerating the implementation of innovative practices and technologies. We remain committed to our integrated self-perform model, which we believe will enable us to generate attractive earnings and cash flows over time.

"Additionally, we announced today that we are pursuing a sale of our Technology business, which we believe will unlock significant value for stakeholders. We plan to use the proceeds from the sale to significantly enhance CB&I's financial strength and flexibility by eliminating the majority of our debt and reinvesting in our E&C and Fabrication Services businesses. We envision a bright future for CB&I as a highly focused company with tightly integrated EPC and fabrication capabilities serving the LNG, petrochemical, refining and gas power generation markets."

114.    The 8-K filed on August 15, 2017, stated, in part:

As previously disclosed in our Form 10-Q for the quarter ended June 30, 2017 filed with the Securities and Exchange Commission on August 9, 2017 (the "Form 10-Q"), as of June 30, 2017, Chicago Bridge & Iron Company N.V. ("CB&I," "we" or "us") would not have been in compliance with the financial covenants with respect to the following debt arrangements and instruments:

- our five-year, $1.15 billion committed revolving credit facility (the "Revolving Facility"), with Bank of America N.A. ("BofA"), as administrative agent, and BNP Paribas Securities Corp, BBVA Compass, Crédit Agricole Corporate and Investment Bank ("Crédit Agricole") and TD Securities, each as syndication agents;

- our five-year, $800 million committed revolving credit facility (the "Second Revolving Facility"), with BofA, as administrative agent, and BNP Paribas Securities Corp., BBVA Compass, Crédit Agricole and Bank of Tokyo Mitsubishi UFJ, each as syndication agents;

- our five-year, $500 million term loan (the "Second Term Loan" and collectively, with Committed Facilities, "Bank Facilities"), with BofA as administrative agent;

- our senior notes (series A, B, C and D) totaling $800 million in aggregate principal amount outstanding as of June 30, 2017 (the "Senior Notes"); and

- our senior notes totaling $200 million in aggregate principal amount outstanding as of June 30, 2017 (the "Second Senior Notes" and, together with the Senior Notes, the "Notes", and, together with the Revolving Facility, the Second Revolving Facility, the Second Term Loan and the Senior Notes, the "Senior Facilities").

115.    As reported by *MarketWatch* on August 12, 2017, in an article entitled "Chicago Bridge & Iron's stock plunges as company takes action to 'stay alive'", and subtitled "Shares suffered second-biggest one-day selloff since going public in March 1997":

Shares of Chicago Bridge & Iron Co. plunged on heavy volume to an 8-year low, as the energy infrastructure services firm was forced to take "decisive action" to bolster its financial position after reporting a large surprise loss and slashing its outlook.

The actions come after CB&I said late Wednesday that it would haven't been in compliance with certain debt covenants at the end of June without amendments to its credit agreements.

"We are implementing a comprehensive corporate and operating cost reduction program, which we expect will generate savings of $100 million on an annualized basis," said Chief Executive Patrick Mullen late Wednesday in a post-earnings conference call with analysts, according to a transcript provided by FactSet. "We are

committed to continuing to take decisive action to put CB&I on a more sound, long-term footing."

Mullen assumed the CEO role effective July 1, after former CEO Philip Asherman announced his retirement in May.



The stock CBI, -0.61% tumbled $4.36, or $27%, to the lowest closing price since July 2009. It suffered the second-biggest percentage decline since it went public in March 1997. The biggest selloff was 31% on Feb. 25, 2009. Volume was 32.8 million share, or five times the full-day average.

Among the actions taken, Mullen said the company was pursuing the sale of its technology business, and plans to use the proceeds to pay down debt and reinvest in its remaining businesses. He said in the call with analysts that he is looking for a valuation of more than $2 billion for the technology business.

Analyst Sameer Rathod said he believed the technology business was the "crown jewel" for CB&I. And given that the company was being forced to sell the business "to stay alive," the company's expected valuation may be a stretch.

"Given that this is a distress sale, in our view, . . . any potential buyer would be able to get the business at a discount compared to what the company wants for it," Rathod wrote in a note to clients.

The company said it was suspending its quarterly dividend, effectively immediately, which is expected to result in cash savings of $28 million to $30 million. The last quarterly dividend paid was 7 cents a share on June 30.

[Intraday stock chart omitted.]

The actions were announced as the company reported a second-quarter net loss of $425.4 million, or $4.22 a share, after a profit of $123.8 million, or $1.17 a share, in the same period a year ago. Excluding discontinued operations, the loss of $3.02 a share compares with analyst expectations of a profit of 48 cents, according to FactSet.

Revenue fell to $1.28 billion from $2.16 billion, which was just a little more than half the FactSet consensus of $2.47 billion.

The engineering and construction business was particularly weak, with revenue falling to $702.2 million from $1.5 billion, due primarily to the wind-down of a large cost-reimbursable liquefied natural gas (LNG) project in the Asia-Pacific region, and lower revenue from two U.S.-based LNG projects.

The technology business, which offers licensed process technologies to the hydrocarbon industries and equipment for use in petrochemical facilities, oil refineries and gas processing plants, reported revenue growth of 13% to $72.8 million.

The company now expects second half revenue of $3.7 billion to $4.0 billion and earnings of $1.00 to $1.25 a share. Combined with first-half revenue of $3.11 billion, the implied 2017 outlook of $6.81 billion to $7.11 billion was well below previous revenue guidance of $9.5 billion to $10.5 billion.

Despite the record drop in CB&I's stock, Macquarie's Rathod believes it could still fall further. He reiterated his underperform rating and cut his stock price target to $10, which is 11% below current levels, from $14.

 "We still do not find the risk-reward favorable for the stock, given the large amount of fixed-price risk the company continues to hold, which was likely signed when the company needed advance payables," Rathod wrote. "Additionally, the company is likely to lose top engineering talent to competitors, face tougher negotiations from any potential clients, all the while still facing an anaemic hydrocarbon end-market."

The stock has now lost 62.3% year to date, while the SPDR Energy Select Sector exchange-traded fund XLE, +0.22%  has shed 14.6% and the S&P 500 index SPX, +0.18%  has gained 8.9%.

**FIDUCIARY ACTION WOULD NOT HAVE RESULTED IN MORE HARM
THAN GOOD**

116.    Defendants, as CB&I insiders, knew or should have known that Company Stock was artificially inflated as a result of construction delays and cost overruns on contracts to complete construction of the Nuclear Projects during the Class Period identified herein. Defendants should have taken action to protect the Plans from holding and purchasing artificially inflated CB&I Stock.  Instead, Defendants did the opposite, and effective January 1, 2014, the Plan was amended and restated to allow Participants to transfer a portion of their account balance into the CB&I N.V. stock fund as long as the transfer does not cause the balance of the Participant's accounts held in the CB&I N.V. stock fund to exceed 20% of the Participant's entire account balance.

117.    Rather than doing nothing (as they did), Defendants could have taken numerous steps to fulfill their fiduciary duties to the Plans under ERISA.  As set forth more fully below, none of those steps (a) would have violated securities laws or any other laws, or (b) would not have been more likely to harm the Plans' CB&I Stock holdings than to help it, and could have avoided or mitigated the harm caused to the Plans.

**Disclosure**

118.    Disclosure, at the least, would have prevented the Plans from acquiring (through uninformed investment decisions and continued investment of matching contributions) additional shares of artificially inflated Company Stock: the longer the concealment continued, the more of the Plans' good money went into a bad investment. Full disclosure would have cut short the period in which the Plans bought Company Stock at inflated prices. If Defendants would have predicted large fund inflows from available data, they would have concluded that preventing

artificially inflated inflows would be a net benefit considering shares held would decrease to their fair value upon disclosure of artificial inflation anyway.

119.    Defendants should have considered, *inter alia*, that early and candid disclosures would have caused the stock to drop less because disclosure would have mitigated reputational damage to the Company, minimized the risk of nondisclosure claims arising from the CB&I's violation of antitrust laws, and lessened the risk of defending against governmental investigations and associated penalties. *See* Richard A. Booth, Article: *Class Conflict in Securities Fraud Litigation*, 14 U. Pa. J. Bus. L. 701, 708-09 ("holders suffer a further loss because of the expenses suffered by the corporation in defending itself against the class action and any other enforcement proceedings (not to mention possible fines and intangible costs of management distraction").

120.    Disclosure would and/or could have: (1) caused the Plans to pay a fair, instead of inflated, amount for the outsized shares it was purchasing, (2) caused the Plans to receive slightly less for the relatively insignificant amount of shares that it was selling, and (3) expedited the inevitable losses by causing CB&I's Stock price to decrease because of the removal of artificial inflation therefrom. Defendants could not have concluded that there was not any way for them to ameliorate such losses without violating insider trading laws. Given that CB&I's Stock would fall to its fair value, and given the outsized purchases compared to losses, the Plans' fiduciaries could not have concluded that allowing purchases of artificially inflated CB&I Stock might have done more good than harm to the Plans. Simply stated, prudent fiduciaries cannot both purport to depend upon an efficient market and simultaneously assume that an efficient market will overreact to a disclosure.

121. Moreover, disclosure could not have caused a market overreaction because CB&I is a widely-traded stock on a major stock exchange that is covered by multiple analysts. Profit seeking arbitrageurs would have act quickly to remove inefficiencies from any market overreaction and bring the price back to fair value. Defendants could not conclude that any market overreaction to disclosure would be other than temporary while also positing the market was efficient because CB&I Stock was either efficient or inefficient, but not both at the same time and in the same respect.

122. Defendants could have disclosed (or caused others to disclose) CB&I's construction delays and cost overruns on contracts to complete construction of the Nuclear Projects so that CB&I Stock would trade at a fair value. This would have allowed the continued expansion of employee ownership of Company Stock—but at fair value—while also allowing Defendants to comply with their fiduciary duties. By way of example, the Brief of the Secretary of Labor as *Amicus Curiae in Support of Plaintiff-Appellees* in Whitley v. BP, P.L.C., No. 15-20282, Dkt. No. 70 (5th Cir. Mar. 11, 2016) (the "DOL *Amicus*"), recognized "one option could be for a plan fiduciary, representing the plan as an investor in company stock, to question the corporate insiders when they participate in investor conference calls." *Id.* at 20 n.4.

123. Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including, but not limited to, disclosing material information or freezing the Fund prior to May 1, 2017, which may have reduced the price of CB&I Stock to its fair market value, and therefore the value of the Plans' assets to its fair market value, the Plans and Participants would have avoided later losses unnecessarily suffered by the disproportionate purchases compared to sales of CB&I by the Fund. As succinctly stated by the court in an analogous action, "[d]isclosure might not have prevented the Plan from taking a loss on [company] stock it already held; but it

would have prevented the Plan from acquiring (through Plaintiffs' uninformed investment decisions and through continued investment of matching contributions) additional shares of overpriced [company] stock: ***the longer the fraud continued, the more of the Plan's good money went into a bad investment; and full disclosure would have cut short the period in which the Plan bought at inflated prices.***" *In re Honeywell Int'l ERISA Litig.*, No. 03-1214 (DRD), 2004 U.S. Dist. LEXIS 21585, at *42-*43 (D.N.J. Sept. 14, 2004) (emphasis added).

124.    Considering the duration of non-disclosure and the considerable amount invested in CB&I during the Class Period, no reasonable fiduciary could have concluded that an early, candid disclosure could have done more harm than good to the Plans.

**Freeze Purchases**

125.    As outlined above, the Company Stock Fund was frozen effective May 1, 2017. Prior to that date, Defendants, and specifically CB&I, could have (and should have) directed that all Company and Plans Participant contributions held in cash or some other short-term investment in a unitized stock fund rather than be used to purchase artificially inflated Company Stock. A refusal to purchase Company Stock is not a "transaction" within the meaning of insider trading prohibitions and would not have required any independent disclosures that could have had a materially adverse effect on the price of Company Stock. A prudent fiduciary in similar circumstances could not have viewed this decision as more likely to harm Participants than to help them, and, if Defendants had considered the prudence of Company Stock as a Plans investment option, it is the only rational choice they could have made given the data available to them. However, Plaintiffs are informed and believes that Defendants failed to take any such action.

126.   ERISA requires the fiduciaries of a pension plan to act prudently in managing the plan's assets, including employer stock. Fiduciaries of ERISA plans that hold employer stock are subject to the same duty of prudence that applies to ERISA fiduciaries in general, except that they need not diversify the fund's assets.

127.   Plaintiffs' claims exist, in part, because Defendants, who were CB&I and its employees, ignored their knowledge that Company Stock was artificially inflated. While ERISA allows corporate insiders to serve as fiduciaries, it does not allow those corporate insiders to ignore problems discovered as a result of their employment with a company, especially where compliance with ERISA would not require violation of securities laws (and, indeed, where the objectives of ERISA and the securities laws could have been served by the same prudent actions). Defendants' obligation to take actions to protect the Plans was triggered as soon as they knew or should have known that the share price of Company Stock was artificially inflated. If Defendants had timely complied with their duties under ERISA, there would have been little or no artificial increase in the share price before protective action was taken.

128.   ERISA required Defendants to prevent and/or mitigate, to the extent legal and possible, damages to the Plans and Participants caused by the artificial inflation of Company Stock that Defendants learned about in their corporate capacity. To state a claim for breach of the duty of prudence based on inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it.

129.   At no time during the Class Period did Defendants, in their fiduciary capacity, take any action to protect Participants and the Plans from the impact of the non-disclosures of

material information on the existing holdings of the Fund and continued purchasing and holding of Company Stock at inflated prices.

130.    Defendants could have mitigated damages to the Plans. Before an independent fiduciary was appointed, Defendants were fully responsible for the plan. After an independent fiduciary was appointed, nothing constrained Defendants from consulting with the Plans' independent fiduciary regarding artificial inflation and ceasing to invest those assets exclusively in Company Stock, directing that contributions be diverted from Company Stock into prudent investment options based upon the Plans Participants' instructions or, if there were no such instructions, the Plans' default investment option, and/or protect Participant through unitization of the Fund. What Defendants could not do was "pass the buck" to an independent fiduciary while ignoring their breaches of fiduciary duty, remaining Plans fiduciaries for all other purposes but ignoring the imprudence of the Fund.

131.    These actions would not necessarily have implicated, let alone been in violation of, federal securities laws or any other laws. Nor would ceasing to purchase additional Company Stock likely send a negative signal to the market based upon disclosures of Plans purchases in Forms 11-K. Based on the Forms 11-K filed on behalf of the Plans, the Plans' purchases alone were not large enough to affect the trading price of CB&I Stock. Given the relatively small amount of CB&I Stock that might not have been purchased by the Plans in comparison to the enormous volume of actively traded shares, it is extremely unlikely that this proposed decrease in the number of shares would have had, considered alone, an appreciable adverse impact on the price of CB&I Stock.

132.    Instead of taking (or even considering) a prudent course of action, Defendants allowed Participants who chose to invest their retirement savings in the Fund to pay artificially

inflated prices for CB&I Stock during the Class Period in excess of any artificially inflated benefits received by any Participants who transferred assets out of the Fund. Participants who invested in Company Stock were damaged by overpaying for CB&I Stock, and they bore the foreseeable losses which could have been avoided by prudent action by Defendants. No matter what happens to the stock price in the future, Participants were damaged by paying the excessive artificial price of CB&I Stock, and so they have fewer shares of CB&I Stock than they would have had had CB&I's Stock been trading at a fair price. No matter what the price of CB&I Stock is at any time in the future, as long as that price remains above zero Participants will bear losses because they will have fewer shares to sell.

133.    Instead of disclosing CB&I Stock's artificial inflation, Defendants continued to allow the Plans' damages to increase as the Plans continued purchasing artificially inflated shares, on balance, while only inevitably delaying a price decline for the shares held. Participants, on balance, were thus harmed by Defendants' inaction. Participants were also deprived of their entitlement to prudent management and whatever the balance of their accounts would have been had their entitlement to prudent management been honored.

**Utilize the Fund's Buffer**

134.    Defendants were fully responsible for the Plans and nothing constrained Defendants from protecting Participants through unitization of the Fund.

135.    Instead of freezing the Fund to purchases and sales, Defendants could have utilized the Fund's buffer, which held cash or cash equivalents, as a hedging product, since the Fund was only required to invest primarily in employer securities.

136.    Participants could have invested in the Fund without the Fund purchasing shares of Company Stock if Defendants directed the Fund to hold incoming assets in cash until

Company Stock was no longer artificially inflated. Participants would still be able to purchase and sell units of the Fund, and the Fund would still closely track Company Stock, but further Plans assets would not be exposed to the artificial inflation in Company Stock. Because no purchase or sale of Company Stock would be required, and because the Fund's buffer was not otherwise disclosed, this option would not require disclosure beyond, possibly and at most, the limited annual Form 11-K disclosure.

## Legally Minimize Stock Purchases

137.    Had Defendants simply discretionarily directed those cash assets be placed into the Plan's default investment fund, or allocated based upon Participants instructions, the Plans would have saved at least millions, and likely tens of millions, of dollars.

## Divert Participant Contributions

138.    Defendants also should have redirected Participant contributions to the Fund into prudent investment options based upon the Participants' instructions or, if there were no such instructions, the Plans' default investment option.

139.    Neither this action nor the other actions proposed herein would have implicated, let alone been in violation of, federal securities laws or any other laws. Nor would the Plans' ceasing to purchase additional Company Stock likely have sent a negative signal to the market that would be more likely to harm Participants than help them.

## Targeted Letters to Participants re Diversification

140.    Defendants also could have sent targeted letters to Participants who had not diversified their Company matching contributions, reminding them in a simple and direct manner that they had a right to diversify their Company matching contributions, that they had not done so, and that overconcentration in employer securities is risky.

141.    A short targeted letter would only enunciate the benefits of diversification and the danger of overconcentration in employer securities, and would, in no way, require Defendants to diversify the Fund itself. Furthermore, such a letter would have done absolutely no harm, but would have done some good—at least some Participants may have evaluated their holdings and/or purchases in the Fund and diverted those holdings and/or purchases to more diversified options.

**Resign as Plans Fiduciaries**

142.    Defendants could have resigned as Plans fiduciaries to the extent they could not act loyally and prudently.

143.    While resigning as fiduciaries might shift responsibility to other fiduciaries, Defendants as fiduciaries *and insiders*, were obliged to do so if they knew CB&I Stock was artificially inflated. While *"most* investors—knowing that they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information—will rely on the security's market price as an unbiased assessment of the security's value in light of all public information[,]" (*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2410-11 (2014) (emphasis in original, citation omitted)), Defendants were not "most investors" but were, instead, experts with intimate knowledge and a superior understanding of CB&I and its problems. Defendants were duty-bound by the trust laws that inform ERISA's fiduciary duties,[10] to use their superior knowledge as fiduciaries to the extent it was legal to do so.[11]

---

[10] "[A]n ERISA fiduciary's duty is derived from the common law of trusts[.]" *Tibble v. Edison, Int'l*, 135 S. Ct. 1823, 1828 (2015).

[11] *See* Restatement 2d of Trusts, § 174 (""The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property; and *if the trustee has* or procures his appointment as trustee by representing that he has *greater skill than that of a man of ordinary prudence, he is under a duty to exercise such skill.")*

144.    Defendants could not simply rely upon CB&I Stock's market price if they knew CB&I Stock's price exceeded its fair value. Defendants could not breach their fiduciary duties because replacement fiduciaries *might* make the same decision they made. Replacement fiduciaries might, by contrast, take the resignations as an ominous sign and take action with respect to the Fund, without having inside information, but breaching fiduciary duties because resignation might not effectuate change is contrary to the law of trusts and ERISA. To the extent Defendants possessed greater skill or knowledge than a man of ordinary prudence, they were simply obliged to use that greater skill or resign from their positions.

**Sought Guidance**

145.    Further, Defendants also could have sought guidance from the DOL or SEC as to what they should have done, and/or retained other outside experts to serve either as advisors or as independent fiduciaries specifically for the Fund.

146.    None of these actions would have implicated, let alone been in violation of, federal securities laws or any other laws. Nor would the Plans' ceasing to purchase additional Company Stock likely have sent a negative signal to the market that would be more likely to harm Participants than help them.

**Defendants Allowed CB&I's Stock to be Hyped Instead of Protecting the Plans**

147.    During the Class Period, CB&I and the other Defendants continued to issue misstatements about CB&I's construction delays and cost overruns on contracts to complete construction of the Nuclear Projects, keeping CB&I Stock artificially inflated while failing to take any of the above noted actions.  Scope of construction delays and cost overruns on contracts to complete construction of the Nuclear Projects would only fully be disclosed years later.

**THE RELEVANT LAW: CLAIMS FOR RELIEF UNDER ERISA**

148.    ERISA requires that every plan name one or more fiduciaries who have "authority to control and manage the operation and administration of the plan."   ERISA § 1102(a)(1). Additionally, under ERISA, any person or entity, other than the named fiduciary that in fact performs fiduciary functions for the Plans, is also considered a fiduciary of the Plans.  A person or entity is considered a plan fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

149.    At all relevant times, Defendants are/were, and acted as, fiduciaries within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

150.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

151.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

152.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

153.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the highest known to the law and entail, among other things:

        (a)    the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

        (b)    the duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

        (c)    the duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

154.    Accordingly, if the fiduciaries of a plan know, or if an adequate investigation would reveal, that an investment option is no longer a prudent investment for that plan, then the fiduciaries must disregard any plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other, suitable, prudent investments.

155.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

156.   Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## COUNT I

### FAILURE TO PRUDENTLY MANAGE THE PLANS' ASSETS IN VIOLATION OF ERISA §§ 404(a)(1)(B) AND 405

### (BY THE COMPANY AND THE COMMITTEE DEFENDANTS)

157.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

158.   This Count alleges fiduciary breaches against the Company and the Committee and Administrator Defendants (collectively, the "Prudence Defendants") for continuing to allow the investment of the Plans' assets in CB&I Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because CB&I Stock was artificially inflated during the Class Period.

159.   At all relevant times, as alleged above, the Prudence Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they

exercised discretionary authority or control over the administration and/or management of the Plans and/or disposition of the Plans' assets.

160.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that all investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Prudence Defendants were responsible for ensuring that all investments in Company Stock in the Plans were prudent.  The Prudence Defendants are liable for losses incurred as a result of such investments being imprudent.

161.    Upon information and belief, Defendants failed to engage in a reasoned decision-making process regarding the prudence of CB&I Stock.  An adequate investigation by Defendants would have revealed the risks of investing in artificially inflated CB&I Stock and caused a reasonable fiduciary to conclude that the Fund was over-valued and likely to fall in price during the Class Period. A prudent fiduciary would have acted to prevent or mitigate the losses that the Plans experienced during the Class Period, but the Defendants failed to do so.

162.    The Prudence Defendants breached their duties to prudently manage the Plans' assets.  During the Class Period, the Prudence Defendants knew or should have known that, as described herein, Company Stock was not a suitable and appropriate investment for the Plans.  Yet, during the Class Period, despite their knowledge of the imprudence of the investment, the Prudence Defendants failed to take any meaningful steps to protect the Plans' Participants.

163.    In *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015), the Supreme Court reaffirmed the fiduciary's ongoing duty to monitor the suitability of a plan's investment options. *Tibble* held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder

trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." Id. at 1828. In so holding, *Tibble* referenced with approval the Uniform Prudent Investor Act (the "UPIA"), treatises, and seminal decisions confirming the duty.[12]

164.     When enforcing ERISA's fiduciary duties, courts focus not only on the merits of a transaction, but also on the thoroughness of the investigation into the merits of the transaction. A "pure heart and an empty head" are not defenses to breaches of ERISA's fiduciary duties. *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983). Defendants failed to assess on a regular basis whether CB&I Stock was an appropriate investment for the Plan. Defendants simply could not have engaged in a reasoned decision-making process, consistent with the duties of a prudent fiduciary, and loyally concluded that CB&I Stock was an appropriate investment option for the Plan because the Company has had to take drastic action to "stay alive" as its outlook was slashed, it had to amend its credit agreements to avoid default, and management sought to put the company on "a more sound, long-term footing."

165.     Given the totality of circumstances here, no prudent fiduciary could have made the decision Defendants made to retain and/or continue purchasing the Fund as a Plan investment during the Class Period.

166.     Further, the excessive risk imposed on Participants' retirement savings required Defendants to exchange the CB&I Stock for another investment option, such as Treasury bills or the Plan's default investment options.

_____

[12] *Tibble* cites with approval to the UPIA, which undertakes to update trust investment law and recognizes that "the duty of prudent investing applies both to investing and managing trust assets. . . ." 135 S. Ct. at 1828 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, UPIA § 2(c) (1994)). A comment explains that "'[m]anaging' embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." UPIA, comment § 2.

167.    Defendants, instead, waited until May 1, 2017, to freeze the Fund to new purchases, but allowed the Plan to continue to hold CB&I Stock.

168.    The Prudence Defendants also breached their duty of prudence by failing to provide complete and accurate information regarding CB&I's true financial condition and, generally, by conveying inaccurate information regarding the Company's business and industry. During the Class Period, upon information and belief, Defendants fostered a positive attitude toward Company Stock, and/or allowed Participants to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning the imprudence of investment in Company Stock.  As such, Participants could not appreciate the true risks presented by investments in Company Stock and therefore could not make informed decisions regarding their investments in the Fund.

169.    As a result of Defendants' knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning CB&I's business activities, any generalized warnings of market and diversification risks that Defendants made to Participants regarding the Plans' investment in the Fund did not effectively inform the Participants of the past, immediate, and future dangers of investing in Company Stock.

170.    The Prudence Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plans from inevitable losses.  The Prudence Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plans, yet the Prudence Defendants made no effort to remedy those breaches.

171.    As a direct and proximate result of the breaches of fiduciary duties during the Class Period alleged herein, the Plans and, indirectly, the Plans' Participants, lost a significant

portion of their retirement investments. Had the Prudence Defendants taken appropriate steps to comply with their fiduciary obligations during the Class Period, Participants could have liquidated some or all of their holdings in Company Stock, and refrained from spending hundreds of millions of dollars on artificially inflated CB&I Stock, and thereby eliminated, or at least reduced, losses to the Plans and themselves.

172.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by Defendants' breaches of fiduciary duties alleged in this Count.

**COUNT II**

**BREACH OF DUTY OF LOYALTY IN
VIOLATION OF ERISA §§ 404(a)(1)(A) AND 405**

**(BY ALL DEFENDANTS)**

173.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

174.    This Count alleges fiduciary breaches against the Company, Monitoring Defendants and Committee and Administrator Defendants (collectively, the "Loyalty Defendants"), for continuing to allow the investment of the Plans' assets in CB&I Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because CB&I Stock was artificially inflated during the Class Period.

175.    At all relevant times, as alleged above, the Loyalty Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

176.   ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty; that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

177.   The duty of loyalty includes the duty to speak truthfully to the Plans and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.   As the Supreme Court "succinctly explained" in *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996), "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries."

178.   During the Class Period, the Loyalty Defendants breached their duty to avoid conflicts of interest and to promptly resolve them, by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plans' investments in Company Stock (even though an independent fiduciary was appointed soon after CB&I Stock ceased being artificially inflated); and, by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plans' investment in the Company's securities.

179.   During the Class Period, upon information and belief, certain Defendants, including the Monitoring Defendants, made direct and indirect communications with the Plans' participants in which they omitted or misrepresented information regarding or materially related to investments in Company Stock.   These communications included, but were not limited to, conference calls with analysts, SEC filings, annual reports, press releases, and Plan documents

(including Summary Plan Descriptions). Defendants, including the Monitoring Defendants, also acted as fiduciaries to the extent of this communication activity.

180.     Further, Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press, concerning employees' natural bias toward investing in company stock, including that:

(d)     Out of loyalty, employees tend to invest in company stock;

(e)     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(f)     Employees tend not to change their investment option allocations in the plan once made; and

(g)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk.

181.     Knowing of these natural biases toward investment of Company Stock, Defendants should have been on high alert to protect the interests of the Plans' participants. Defendants, however, disregarded their duties of loyalty, to the benefit of the Company, as demonstrated by the Plans' massive holding and purchase of Company Stock with the Plans' assets.

182.     Further, to the extent that CB&I satisfied its Plan matching obligations using artificially inflated employer securities which it already held, Defendants, who knew or should have known CB&I Stock was artificially inflated, participated knowingly and significantly in deceiving Participants in order to save the employer money at the Participants' expense, which violates ERISA's duty of loyalty.

183.    The Loyalty Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plans from inevitable losses.  The Loyalty Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plans, yet the Loyalty Defendants made no effort to remedy them.

184.    As a consequence of the Loyalty Defendants' breaches of fiduciary duty during the Class Period by putting the interests of themselves and the Company ahead of the Plans and its participants, the Plans suffered tens of millions of dollars in losses, as its holdings of Company Stock were devastated.  If the Loyalty Defendants had discharged their fiduciary duties to loyally manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans and, indirectly, Plaintiff and the other Participants, lost a significant portion of their retirement investments.

185.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

**FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES
AND PROVIDE THEM WITH ACCURATE INFORMATION
IN VIOLATION OF ERISA § 404**

**(BY THE COMPANY AND THE MONITORING DEFENDANTS)**

186.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

187.    This Count alleges fiduciary breaches against the Monitoring Defendants.

188. At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose and prudence.

189. As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of, other fiduciaries of the Plans, namely the Prudence Defendants.

190. Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

191. The monitoring duty further requires that the appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to a plan's participants or for deciding whether to retain or remove them.

192. Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

193.    During the Class Period, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(h)    failing, at least with respect to the Plans' investment in Company Stock, to properly monitor their appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of the appointees' imprudent actions and inaction with respect to Company Stock;

(i)    failing to ensure that the monitored fiduciaries appreciated the true extent of the Company's precarious financial situation and the likely impact that financial failure would have on the value of the Plans' investment in Company Stock;

(j)    to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets and, in particular, the Plans' investment in Company Stock; and

(k)    failing to remove appointees whose performance was inadequate in that they continued to permit the Plans to make and maintain investments in the Company Stock despite the practices that rendered it an imprudent investment during the Class Period.

194.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided.

195.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, and

enabled the breaches by those Defendants, and they failed to make any effort to remedy those breaches despite having knowledge of them.

196.    Therefore, as a direct and proximate result of the breaches of fiduciary duty by the Monitoring Defendants during the Class Period alleged herein, the Plans and, indirectly, the Plans' Participants and beneficiaries, lost tens of millions of dollars of retirement savings.

197.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

198.    The wasting of Participants' retirement savings in artificially inflated CB&I Stock could have and would have been avoided, in whole or in part, by Defendants complying with their ERISA-mandated fiduciary duties.

199.    Defendants—who knew or should have known that CB&I Stock was an imprudent retirement investment—chose to, as fiduciaries, continue allowing the Plan to acquire further CB&I Stock, while taking no action to protect their wards as CB&I's condition worsened and the Participants' retirement savings lost millions of dollars.  Prudent fiduciaries would have acted otherwise and taken appropriate actions to protect the Plans and the Participants.

200.    To the extent Defendants were required to take action based on non-publicly disclosed information that they were privy to, at least the following alternative options—which are pled as alternative statements under FED. R. CIV. P. 8(d)(2) to the extent they are inconsistent—were available to Defendants and (a) could have been done without violating securities laws or any other laws, (b) should have been done to fulfill Defendants' fiduciary

obligations under ERISA, and (c) would not have been more likely to harm the Plan than to help it.

201.    First, Defendants could have and should have directed that all Company and Participant contributions to the Company Stock Fund be held in cash rather than be used to purchase CB&I Stock.  The refusal to purchase Company Stock is not a "transaction" within the meaning of insider trading prohibitions.  This action would not have required any independent disclosures that could have had a materially adverse effect on the price of CB&I Stock.

202.    Second, Defendants should have closed the Fund to further contributions and directed that contributions be diverted from Company Stock into other (prudent) investment options based upon Participants' instructions or, if there were no such instructions, the Plans' default investment option.

203.    Third, Defendants could have disclosed CB&I's problems, discussed above, so that CB&I Stock ceased being artificially inflated.

204.    Alternatively, Defendants could have:

- sought guidance from the DOL or SEC as to what they should have done;

- resigned as fiduciaries of the Plans to the extent they could not act loyally and prudently; and/or

- retained outside experts to serve either as advisors or as independent fiduciaries specifically for the Fund.

205.    Instead, Defendants waited until the Plans had suffered tens of millions of dollars in losses during the Class Period because of artificial inflation in CB&I Stock to take any of the protective actions discussed above.

## REMEDIES FOR BREACHES OF FIDUCIARY DUTY

206.    As noted above, as a consequence of Defendants' breaches, the Plans suffered significant losses.

207.    ERISA § 502(a), 29 U.S.C. § 1132(a), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan. . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate. . . ."

208.    As noted above, the Plans and its Participants have suffered tens of millions of dollars in damages as a result of Defendants' breaches of fiduciary duty.  Plaintiff, the Plans, and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans for the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

209.    Each Defendant is jointly and severally liable for the acts of the other Defendants as a co-fiduciary.

## JURY DEMAND

Plaintiff demands a jury.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A.    A judgment that the Defendants, and each of them, breached their ERISA fiduciary duties to the Plans and the Participants during the Class Period;

B.      A judgment compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.      A judgment imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.      A judgment awarding actual damages in the amount of any losses the Plans suffered, to be allocated among the Plans participants' individual accounts in proportion to the accounts' losses;

E.      A judgment requiring that Defendants allocate the Plans' recoveries to the accounts of all Participants who had any portion of their account balances invested in CB&I Stock maintained by the Plans in proportion to the accounts' losses attributable to the decline in the price of CB&I Stock;

F.      A judgment awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      A judgment awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      A judgment awarding equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated: October 19, 2017           By: _____

                                              Michael J. Klein
                                              **STULL, STULL & BRODY**
                                              6 East 45th Street
                                              New York, NY 10017
                                              Telephone: (212) 687-7230
                                              Facsimile: (212) 490-2022
                                              Email: mklein@ssbny.com

                                              **ATTORNEYS FOR PLAINTIFF**