```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/24/2018
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
:
RAMESH C. KINRA, et al.,                                      :
                                 Plaintiffs,    :
:     17 Civ. 4251 (LGS)
            -against-                                        :
:     <u>OPINION & ORDER</u>
CHICAGO BRIDGE & IRON CO., et al.,                            :
                                Defendants.    :
:
:
------------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

       Plaintiff Ramesh C. Kinra, on behalf of the Chicago Bridge & Iron Savings Plan and the Shaw Group Inc. 401(k) Plan (the "Plans"), individually and as representative of a putative class of participants of the Plans, brings this action against Chicago Bridge & Iron Company ("CB&I" or the "Company") and others pursuant to the Employment Retirement Income Security Act of 1974, as amended by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1104(a), et seq., ("ERISA"), for breach of a fiduciary's duty of prudence and duty of loyalty, and for failure to monitor. Plaintiff alleges that Defendants breached their duties to the Plans for continuing to offer the common stock of CB&I ("Company Stock") as an investment option in the Plans when Defendants knew or should have known that the price of the stock was improperly inflated. Defendants move to dismiss the Amended Class Action Complaint (the "Complaint" except "Amended Complaint" when discussed in relation to the initial Complaint ("Initial Complaint")) under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 12(c). For the reasons that follow, the motion is granted and the Complaint is dismissed.

**I.     BACKGROUND**

The following is based on allegations in the operative Amended Complaint, documents attached to or integral to the Complaint, and facts of which the Court is permitted to take judicial notice. *Goel v. Bunge*, Ltd., 820 F.3d 554, 559 (2d Cir. 2016). As required for the present motion, all factual allegations in the Complaint are assumed to be true. *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

**A. The Parties and the Plans**

Defendant CB&I provides various services in the energy infrastructure market. The Plans are defined contribution plans under the meaning of ERISA and intended to be retirement plans for CB&I employees. Plaintiff Kinra was a CB&I employee and a participant of the Plans. Defendants are the Plans' Investment Committee and nine of its individual members, the Plans' Administrator, the Corporate Controller/Chief Accounting Officer, and the Chief Human Resources Officer. (The individual defendants are hereafter referred to as the "Individual Defendants.") The Corporate Controller/Chief Accounting Officer and the Chief Human Resources Officer signed SEC filings on behalf of the Plans' Administrator.

CB&I has overall responsibility for the administration and operation of the Plans, which it discharges by appointing the Trustee, the Investment Committee and the Plans' Administrator. The Investment Committee is responsible for investing the Plans' assets and monitoring the Plans' investment funds' performance. The Investment Committee may terminate the use of any investment fund as it deems appropriate. The Plans' Administrator is responsible for administering and enforcing the Plan in accordance with the Plans and the Trust Agreement.

Plan Participants could "direct the investment of their account balances into any or all of a number of investment options offered by the Plan," including a fund invested in Company Stock ("the Company Stock Fund").

Under the 2013 Plan Document, a Participant could invest up to 100% of its Accounts in the Company Stock Fund. However, a Participant could not elect to transfer into the Company Stock Fund any portion of her Accounts already invested in another fund. Under the 2014 Plan Document, a Participant was permitted to make such a transfer, as long as the Participant's Accounts did not exceed 20% invested in Company Stock. Most recently, under the Summary Material Modification of the Plan Document, as of May 1, 2017, no new investments or transfers into the Company Stock Fund were permitted.

### B. CB&I's Acquisition of Shaw

On July 30, 2012, CB&I announced its acquisition (the "Acquisition") of Shaw Group Inc. ("Shaw") for $3 billion. As a part of the Acquisition, CB&I acquired Stone & Webster Inc. ("Stone"), Shaw's subsidiary. Shaw was involved in the construction of new nuclear power plants in Waynesboro, Georgia and Jenkinsville, South Carolina (the "Nuclear Projects"). On October 30, 2013, in its Form 10-Q, CB&I disclosed $2,826,450,000 of estimated total goodwill as a result of the Acquisition. On February 24, 2014, in its Form 10-K, CB&I disclosed $3,296,530,000 of total goodwill in conjunction with the Acquisition.

From June 10, 2014, to June 12, 2014, various reports stated that CB&I experienced cost overruns and delays with the Nuclear Projects. During the same period, the price of Company Stock fell from $83.30 per share to $76.72 per share, or almost 8%, on higher than average trading volume.

On June 17, 2014, *SeekingApha.com* reported in an article that CB&I used creative acquisition accounting to create a $1.56 billion loss reserve that could be converted directly into gross profit to offset costs, thereby dramatically inflating reported profitability. The same article reported that in reality, the Nuclear Projects' contracts were severely loss making and that CB&I would be forced to write down goodwill. On the same day, Company Stock fell from $73.45 per share to $68.26 per share.

On July 24, 2014, in its Form 10-Q, CB&I disclosed an $811.3 million decline in its Contract Capital liability for the first six months of 2014, due to the Nuclear Projects' contracts, but reported that the goodwill as a result of the Acquisition remained at roughly $3.3 billion. On the same day, Company Stock fell from $69.48 per share to $63.07. Between October 1, 2014, and October 10, 2014, various reports stated that the Nuclear Projects would cost an additional $1 billion to finish. Company Stock price fell from $57.50 per share $49.38 per share.

In late February 2015, without an intermediate goodwill write down, CB&I began to negotiate an exit to the Nuclear Projects and Stone, by structuring a quitclaim-like deed. Stone thus had no real value and there was no reasonable basis to believe that CB&I would receive any meaningful amount of cash for Stone. On October 27, 2015, CB&I entered into a purchase agreement with Westinghouse Electric Company LLC ("Westinghouse") to sell Stone. According to an August 7, 2017, opinion of the Delaware Supreme Court in action between CB&I and Westinghouse, the terms of the purchase agreement were (1) CB&I agreed to sell Stone for a purchase price of zero; (2) Westinghouse agreed that Chicago Bridge would have no liability for monetary damages post-closing; (3) Westinghouse agreed to indemnify CB&I for all claims and liabilities of Stone. In effect, the only consideration that CB&I received for the

transfer of Stone was to be relieved of all liabilities and claims with respect to Stone. On August 8, 2017, Company Stock closed at $16.25 per share.

## II. DISCUSSION

### A. Standing and Subject Matter Jurisdiction

The Complaint is dismissed for lack of subject matter jurisdiction; Plaintiffs cannot cure the initial named Plaintiff's lack of Article III standing via Rule 17 substitution.

#### 1. Rule 12(b)(1) Legal Standard

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortland St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (internal quotation marks and citation omitted). "The plaintiff bears the burden of alleging facts that affirmatively and plausibly suggest that it has standing to sue. In assessing the plaintiff's assertion of standing, we accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party." *Id.* at 417 (internal quotation marks, citations and alterations omitted). In resolving the question of jurisdiction, the Court can and should "refer to evidence outside the pleadings." *Luckett v. Bure*, 290 F.3d 493, 496–97 (2d Cir. 2002); *accord Lopez v. U.S.*, No. 15 Civ. 9695, 2016 WL 7156773, at *5 (S.D.N.Y. Dec. 7, 2016).

#### 2. Effect of Rule 17 on Subject Matter Jurisdiction

Federal Rule of Civil Procedure 17(a)(3) states that "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been

5

originally commenced by the real party in interest." Fed. R. Civ. P. 17(a)(3). The substitution of the real party in interest may be accomplished by amending the original complaint under Rule 15. *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 19–20 (2d Cir. 1997) (finding that Rule 17(a) should be applied to allow the amendment of the complaint under Rule 15 to substitute the real party); *accord In re Ace Secs. Corp. RMBS Litig.*, No. 13 Civ. 1869, 2015 WL 1408837, at *5–6 (S.D.N.Y. Mar. 26, 2015) (same).

Generally, substitution under Rule 17(a)(3) "should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants." *Advanced Magnetics*, 106 F.3d at 20; *accord BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, No. 14 Civ. 10067, 2017 WL 3610511, at *14 (S.D.N.Y. Aug. 21, 2017); *see also* 6A Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 1555 (3d ed. 2014) (noting the "judicial tendency to be lenient when an honest mistake has been made in selecting the proper plaintiff."). Courts ordinarily grant leave to substitute if: (1) "[t]he complaint's only pertinent flaw was the identity of the party pursuing those claims. In other words, the proposed amended complaint sought only to substitute one name for another; the factual and legal allegations of the complaint would remain unaltered;" (2) "there was [no] indication of bad faith . . . or an effort to deceive or prejudice the defendants" and (3) "the proposed substitution . . . [does not] threaten to prejudice the defendants." *Cortland St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 422 (2d Cir. 2015) (internal quotation marks and citations omitted); *accord BlackRock Allocation Target Shares*, 2017 WL 3610511, at *18.

However, Second Circuit precedent strongly suggests that where, as here, there was no subject matter jurisdiction at the initiation of a suit because the plaintiff lacked Article III

6

standing, a plaintiff cannot remedy that constitutional defect via Rule 17 substitution.  Although the Second Circuit expressly did not reach the question in *Cortlandt*, the Court stated that "in the absence of a plaintiff with standing, [a] lawsuit [is] a nullity, and there [is] therefore no lawsuit pending for the real party in interest to 'ratify, join, or be substituted into' under Rule 17(a)(3) or otherwise."  *Cortlandt*, 790 F.3d at 423.

Many courts have relied upon that dicta from *Cortlandt* in reaching the same conclusion. In *Valdin Investments Corp. v. Oxbridge Capital Mgmt., LLC*, 651 F. App'x 5 (2d Cir. 2016) (summary order), the Second Circuit held that "the sole plaintiff, lacked standing on all of its claims.  Its motion was therefore a nullity from the beginning, so that there is no lawsuit pending for the real party in interest to 'ratify, join, or be substituted into' under Rule 17(a)(3) or otherwise."  *Id.* at 7; *accord, e.g., Klein on behalf of Qlik Techs., Inc. v. Cadian Capital Mgmt., LP*, No. 15 Civ. 8140, 2017 WL 4129639, at *8 (S.D.N.Y. Sept. 15, 2017) ("Rule 17(a) cannot create jurisdiction that does not exist."); *Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12 Civ. 0722, 2012 WL 4849146, at *7 (S.D.N.Y. Oct. 12, 2012) (declining to apply Rule 17 to cure standing deficiency where none of the plaintiffs had "Article III standing on *any* of their claims as of the date the original Complaint was filed.") (emphasis in the original).

It seems self-evident that Rule 17, a procedural rule, cannot resurrect a lawsuit that a court had no constitutional power to adjudicate at the outset.  In the analogous context of Rule 15 intervention, the Second Circuit has made this point explicitly: "[the] Rule 15(c) 'relation back' doctrine does not permit members of a putative class, who are not named parties, to intervene in the class action as named parties in order to revive claims that were dismissed from the class complaint for want of jurisdiction."  *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 110 (2d Cir. 2013).  Likewise, "Rule 24 does not itself provide a basis for

7

jurisdiction . . . since intervention contemplates an existing suit in a court of competent jurisdiction and because intervention is ancillary to the main cause of action, intervention will not be permitted to breathe life into a 'nonexistent' law suit." *Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 160 (2d Cir. 2012). The same underlying principle that "[t]he Federal Rules of Civil Procedure do not extend or limit the jurisdiction of the district courts" should apply equally to Rule 17. *Id.; see also Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 193-94 (2d Cir. 2003) (noting "Rule 17 does not . . . affect jurisdiction and relates only to the determination of proper parties and the capacity to sue.") (citing 4 James William Moore, et al., *Moore's Federal Practice* § 17.13[1] (3d ed. 1999).

Other circuits have taken the same approach. *See, e.g., Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 (Fed. Cir. 2005) ("[I]f the original plaintiff lacked Article III initial standing, the suit must be dismissed, and the jurisdictional defect cannot be cured by the addition of a party with standing") (citation omitted); *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531–32 (6th Cir. 2002) ("The Federal Rules of Civil Procedure cannot expand the subject matter jurisdiction of federal courts beyond the limits of U.S. Constitution. . . . [Rule 17(a) ] must be read with the limitation that a federal district court must, at a minimum arguably have subject matter jurisdiction over the original claims."); *see also* 1 William B. Rubenstein, *Newberg on Class Actions* § 2:8 (5th ed. 2017) ("[I]f a case has only one class representative and that party does not have standing, then the court lacks jurisdiction over the case and it must be dismissed; if the case only had this one class representative from the outset, then there is no opportunity for a substitute class representative to take the named plaintiff's place because this means that the court never had jurisdiction over the matter.").

3. **Rule 17 and This Case**

8

In this case, the Complaint is dismissed for lack of subject matter jurisdiction because the original plaintiff did not have Article III standing and that defect cannot be cured with a Rule 17 substitution of a new plaintiff. "[S]tanding is to be determined as of the commencement of suit." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5 (1992); *accord Disability Advocates*, 675 F.3d at 160. "[T]o establish Article III standing in a class action . . . for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012) (internal quotation marks and citation omitted); *accord Hamlen v. Gateway Energy Servs. Corp.*, No. 16 Civ. 3526, 2017 WL 6398729, at *12 (S.D.N.Y. Dec. 8, 2017).

The Initial Complaint was filed on June 7, 2017, in the name of John J. Giantonio as the named Plaintiff on behalf of a putative class. On August 22, 2017, apparently because Mr. Giantonio could not substantiate that he was a participant in the Plans and therefore a class member, Plaintiff amended the Initial Complaint to substitute Plaintiff Kinra for Plaintiff Giantonio. But because Giantonio was not a participant in the Plans, he had no standing to bring claims against Defendants either individually or on behalf of a class. For the reasons described above, a Rule 17 substitution of plaintiffs cannot rectify Giantonio's lack of standing. The initial action was "a nullity" from the outset, and there was no action into which Plaintiff Kinra can be substituted. *See Cortlandt*, 790 F.3d at 423. Accordingly, the 12(b)(1) motion is granted.

Plaintiff's reliance on *Hackner v. Guar. Tr.*, 117 F.2d 95 (2d Cir. 1941), is unpersuasive. Plaintiff argues that *Hackner* stands for the proposition that plaintiffs can cure *any* jurisdictional defect by substituting a new plaintiff into the case under Rule 17, as long as the substitution happens early in the case. *Hackner* does not stand for that proposition. In *Hackner*,

9

three bondholders commenced a putative class action on behalf of all bondholders, and moved twenty-two days later to replace one of the named plaintiffs with a new plaintiff in order to satisfy the amount in controversy requirement under 28 U.S.C.A. § 41(1). *Id.* at 97. The initial named plaintiffs were members of the class who had Article III standing and remained in the class. The fact that the plaintiffs in *Hackner* could cure a statutory jurisdictional defect via Rule 17 substitution does not mean that Plaintiff here can cure a constitutional standing defect with a Rule 17 substitution, especially where there are no other named plaintiffs with Article III standing.

**B. Breach of the Duties of Prudence and Loyalty**

In the alternative, and to the extent that the Court does have subject matter jurisdiction over this action, the Complaint is dismissed for failure to state a claim under Rules 12(b)(6) and 12(c).

**1. Rule 12(b)(6) and Rule 12(c) Legal Standards**

"On a motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015) (citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[W]hatever documents may properly be considered in connection with the Rule 12(b)(6) motion, the bottom-line principle is that 'once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.'" *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (quoting *Twombly*, 550

U.S. at 563).

Rule 12(c) permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed -- but early enough not to delay trial." Fed. R. Civ. P. 12(c). Motions brought under Rule 12(c) are evaluated using the same standard as a motion to dismiss under Rule 12(b)(6). *See Mantena v. Johnson*, 809 F.3d 721, 727–28 (2d Cir. 2015).

### 2. Sufficiency of the Complaint

The Complaint alleges that Defendants, as CB&I insiders, "knew or should have known that [Company Stock] was artificially inflated as a result of construction delays and cost overruns on . . . the Nuclear Projects," and that Defendants breached their fiduciary duties of prudence and loyalty to the Plans by failing to take one or more of six proposed actions to protect the Plans and their participants from holding and purchasing the stock.

#### a. Knowledge of Alleged Over Valuation of Company Stock

ERISA "imposes a prudent person standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (citing 29 U.S.C. § 1104(a)(1)(B)). The Complaint's claims rest on the assertion that Defendants knew or should have known that the Company Stock was overvalued in the market and failed to take appropriate steps in light of that knowledge.

The claims for breach of the duties of prudence and loyalty fail because the Complaint lacks specific factual allegations about what Defendants knew or should have known about the valuation of the Company Stock. Each Individual Defendant is described in a single paragraph by job title and relationship to the Plan, and is never mentioned again. Similarly, the Complaint describes Defendants Investment Committee and Plans' Administrator each in a single paragraph that quotes from the 2014 Plan Document.

11

The only allegations in the Complaint about Defendants' knowledge are entirely conclusory and not specific to any Defendant. "Scienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading." *C.D.T.S. v. UBS AG*, No. 12 Civ. 4924, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom. Westchester Teamsters Pension Funds v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015) (summary order). The Complaint alleges that "Defendants knew or should have known that CB&I Stock was artificially inflated during the Class Period (October 29, 2013, through the present), as alleged in further detail below." But the knowledge is not detailed below. The Complaint merely states that "Defendants, as CB&I insiders, knew or should have known that Company Stock was artificially inflated as a result of construction delays and cost overruns on contracts to complete construction of the Nuclear Projects . . . ." The Complaint does not allege facts to show that any particular Individual Defendant -- who are CB&I employees in human resources, law and finance -- were aware of delays and costs associated with the Nuclear Projects or aware that these issues were not reflected in the stock price. "[A] fiduciary usually is not imprudent to assume that a major stock market . . . provides the best estimate of the value of the stocks traded on it that is available to him." *Fifth Third*, 134 S. Ct. at 2471 (internal quotation marks and citations omitted).

The Complaint alleges that "Defendants knew or should have known that material facts about CB&I's business had not been disclosed to the market," resulting in an inflated stock price. Nowhere does the Complaint allege who knew what material facts that had not been disclosed to the market. The Complaint cites exclusively to public articles and does not allege any facts to show that the Individual Defendants were privy to non-public information affecting the stock price.

12

To the extent the Complaint seeks to imply that Defendants should have known the stock was overvalued based on public reports, that inference is unwarranted. "[A]llegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible as a general rule, . . . in the absence of special circumstances." *Id.* The Complaint makes no claim of special circumstances to deviate from this general rule. *See, e.g.*, *Rinehart v. Lehman Bros. Holdings, Inc.*, 817 F.3d 56, 65 (2d Cir. 2016) (finding that descriptions of ominous news articles, volatility of Lehman's stock price, downgrades from ratings agencies and criticism from investment analysts "do not nudge the allegations [that the Plan Committee Defendants knew or should have known that investment in Lehman had become increasingly risky] across the plausibility threshold.").[1]

### b. Proposed Measures to Protect the Plans

Even if the Complaint adequately alleged that Defendants knew that the stock was overvalued in the market, the Complaint fails to meet the legal requirements for alleging what Defendants should have done with that knowledge.

Since the Supreme Court's decision in *Fifth Third*, there is no longer a presumption that the fiduciary of an employee stock ownership plan complied with duty of prudence under ERISA. *Fifth Third*, 134 S. Ct. at 2467. Instead, the Supreme Court adopted a new and rigorous pleading standard requiring "careful, context-sensitive scrutiny of [the] complaint's allegations." *Fifth Third*, 134 S. Ct. at 2470. To state a claim for breach of duty of prudence on the basis of nonpublic information, a plaintiff must plausibly allege an alternative action that the defendant

---

[1] That Defendants raised this argument for the first time in its reply does not preclude this Court from considering it. *See Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005); *accord Artists Rights Enforcement Corp. v. Estate of Robinson*, No. 15 Civ. 9878, 2017 WL 933106, at *7 (S.D.N.Y. Mar. 8, 2017) ("A court has discretion to consider an argument made for the first time in a reply brief, though it is not required to do so.").

could have taken that (1) would have been consistent with the securities laws; and (2) a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it.  *Id.* at 2472.  A complaint must allege "facts and allegations" to show that a prudent fiduciary under the circumstances "could not have concluded that the alternative action would do more harm than good." *Amgen Inc. v. Harris*, 136 S. Ct. 758, 760 (2016) (internal quotations omitted).  Plaintiff has not cited a single case that has survived the pleading stage applying this standard.  On the contrary, the cases applying the *Fifth Third* test "have foundered on the pleading requirements." *Price v. Strianese*, No. 17 Civ. 652, 2017 WL 4466614, at *5 (S.D.N.Y. Oct. 4, 2017) (collecting cases).

The Complaint alleges that Defendants, knowing the stock was overvalued, should have undertaken the following:  (1) early disclosure; (2) freezing the purchase of Company Stocks; (3) utilization of the Fund's buffer; (4) discretionarily directing cash assets to be placed in the Plan's default investment fund or redirecting Participant contribution into prudent investment options; (5) sending targeted letters to Participants regarding diversification; (6) resigning as fiduciaries; and (7) seeking guidance from the Department of Labor ("DOL") or the Securities and Exchange Commission ("SEC").  None of these proposed alternative actions satisfies the *Fifth Third* test.

### (i) Early Disclosure

The Complaint advocates as its first alternative, early disclosure of CB&I's construction delays and cost overruns in the construction of the Nuclear Projects.  The Complaint does not plausibly allege that early disclosure would have been so beneficial that a prudent fiduciary could not have concluded that such disclosure would cause more harm than good.

The Supreme Court in *Fifth Third* directed lower courts to consider whether the complaint alleges "that a prudent fiduciary in the defendant's position could not have concluded that . . .

publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." 134 S. Ct. at 2473. Courts in this Circuit and elsewhere have followed this directive and uniformly rejected early disclosure as an alternative that meets the *Fifth Third* test. *See e.g.*, *Lehman Bros.*, 817 F.3d at 68; *Price*, 2017 WL 4466614, at \*6; *Jander v. IBM Corp.*, 205 F. Supp. 3d 538, 546 (S.D.N.Y. 2016); *In re Jpmorgan Chase & Co. Erisa Litig.*, No. 12 Civ. 4027, 2016 WL 110521, at \*3-4 (S.D.N.Y. Jan. 8, 2016), *affd sub nom. Loeza v. John Does 1-10*, 659 F. App'x 44 (2d Cir. 2016); *see also Graham v. Fearon*, No. 17 Civ. 3407, 2018 WL 315098, at \*5-6 (6th Cir. Jan. 8, 2018); *Saumer v. Cliffs Nat. Resources Inc.*, 853 F.3d 855, 864-65 (6th Cir. 2017); *Whitley v BP, P.L.C.*, 838 F.3d 523, 529 (5th Cir. 2016).

The Complaint in substance alleges that early disclosure, despite the likely drop in stock price, would have achieved three main benefits: (1) mitigating reputational damage; (2) lessening the risk of civil and regulatory actions against the Company; and (3) avoiding later losses resulting from the Plans' purchasing additional shares at still inflated prices. Regarding reputational damage, a prudent fiduciary may well have concluded that earlier disclosure would have resulted in more harm by prolonging the period the Company was under a cloud before it was able to shed the Nuclear Projects and its liabilties through the sale to Westinghouse.

The third alleged benefit to early disclosure, "avoiding later losses," is often identified as a benefit of early disclosure. That benefit is not enough that no reasonable fiduciary could conclude that the harm from the drop in stock price and corresponding drop in value of Plan investments is necessarily outweighed by the benefit of Plan participants avoiding future stock purchases at an inflated price. *See, e.g., Graham*, 2018 WL 315098, at \*5-6; *Price*, 2017 WL

15

4466614, at *7; *Jander*, 205 F. Supp. 3d at 545; *Jpmorgan*, 2016 WL 110521, at *4. The same is true of the second alleged benefit of lessening the risk of actions against the Company.

### (ii) Freezing Purchases and Diverting Contributions

The Complaint suggests freezing the purchase of Company Stock and "diverting" contributions that Participants had designated for that purpose into other investments. The Complaint suggests various investment options for where and how those contributions should be diverted -- (1) cash in a unitized stock fund, (2) unspecified "prudent investment options based upon the Plans Participants' instructions," or (3) "the Plans' default investment option" if there are no Participant instructions.

Courts have consistently rejected halting investments in Company Stock as a viable alternative under the *Fifth Third* test, regardless of the proposed alternative investment. The Complaint fails to plead facts showing that a reasonable fiduciary could not conclude that freezing Company Stock purchases would not have been more harmful to the Fund than helpful. First, if the Plans had made public that they were halting all investments in Company Stock, this course of action would be tantamount to early disclosure, discussed above, with the attendant concerns about causing a drop in the stock price that would devalue the Plans' current investments in the stock. A prudent fiduciary might reasonably have concluded that freezing purchases would do more harm than good. *See Fifth Third*, 134 S. Ct. at 2473; *Loeza v. John Does 1-10*, 659 F. App'x 44, 46 (2d Cir. 2016) (affirming the district court's holding that the complaint failed to allege that a prudent fiduciary could not have concluded that freezing purchase in company stock would cause more harm than good); *Price*, 2017 WL 4466614, at *6 (finding that the allegation that the defendants could have halted the plan's investment in the company's stock does not meet the *Fifth Third* test); *Lehman Bros.*, 817 F.3d at 68 (affirming the

16

dismissal of ERISA claims, noting that "[a] prudent fiduciary could have concluded that divesting Lehman stock, or simply holding it without purchasing more, would do more harm than good.") (internal quotation marks and citations omitted).

Second, if the Plans hid the fact that it was ignoring Participants' investment directives and "diverting" their contributions without authorization to securities investments other than the Company Stock Fund, it seems inevitable that such action would run afoul of the Plan Documents and be unlawful with respect to the Participants. Such conduct also would likely violate the securities' laws proscription against the purchase or sale of securities based on nonpublic information, *see* 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5; *see also S.E.C. v. Contorinis*, No. 09 Civ. 1043, 2012 WL 512626, at *1 (S.D.N.Y. Feb. 3, 2012) (finding a defendant who had investment control over a fund and relied on nonpublic material inside information to make opportune trades with fund's assets guilty of criminal securities fraud.), *aff'd* 743 F.3d 296 (2d Cir. 2014), and the securities laws' broad prohibition of deceptive schemes, *see Price*, 2017 WL 4466614, at *8 (finding that the use of a hedging product is not a viable alternative under *Fifth Third* because the Complaint is too vague to evaluate whether the *Fifth Third* test is satisfied, and noting that the proposal may run afoul of the securities laws prohibition of deceptive schemes).

Third, as to investing in cash in a unitized stock fund, the Complaint fails sufficiently to plead that this option satisfies the *Fifth Third* test. The Complaint proposes that the Company Stock Fund would be unitized so that Participants owned units of the fund, which would hold both Company Stock and cash. All future contributions to the fund would be invested exclusively in cash, while the existing investments would remain in Company Stock. The Complaint alleges that "Defendants could have utilized the Fund's buffer, which held cash or cash equivalents, as a hedging product, since the Fund was only required to invest primarily in

17

employer securities. . . . Participants could have invested in the Fund without the Fund purchasing shares of Company Stock if Defendants directed the Fund to hold incoming assets in cash until Company Stock was no longer artificially inflated." The Complaint is unclear about whether the fund currently has investments other than Company Stock; the extent to which cash and other non-Company Stock investments in the fund are required to be limited in quantity, kind and duration; the requisite disclosure under the Plan Documents and the Securities Act of 1933 as to fund investments; how such action could prudently have been undertaken for an indefinite period of time without the hindsight of knowing about the Westinghouse sale; and how investing in cash when Participants thought they were investing in equities could be viewed as a permissible investment strategy. In short, the Complaints lacks allegations to show that a reasonable fiduciary could not conclude that investing in cash within the Company Stock Fund would not have been more harmful to the Fund than helpful.

### (iii) Letters, Resignations and Requests for Guidance

The Complaint's remaining alternatives -- that Defendants "could have sent targeted letters to Participants" regarding diversifying their assets, "resigned as Plans fiduciaries" to send an "ominous sign" to replacement fiduciaries who could take action without the taint of inside information, or "sought guidance from the DOL or SEC" -- raise the same issue as the proposal of earlier disclosure, namely, the possibility of harming the Plans by causing a significant decline in Company Stock price. Because of the negative but vague message these actions would send, a prudent fiduciary could conclude that they would do more harm than good; they may signal that something at the company is seriously wrong but without providing the market with information to gauge the stock's true value. *See Harris v. Amgen, Inc.*, 788 F.3d 916, 925-26 (9th Cir. 2014) (Kozinski, J., dissenting), *cert. granted, judgment rev'd*, 136. S. Ct. 758 (2016); *Price*, 2017 WL

4466614, at *6.  The Complaint pleads no facts showing that a prudent fiduciary would not have found these alternative actions more harmful to the Fund than helpful.

### C. Failure to Monitor

Defendants' motion to dismiss Plaintiffs' claim for failure to monitor is granted. "Plaintiffs cannot maintain a claim for breach of the duty to monitor . . . absent an underlying breach of the duties imposed under ERISA." *Lehman Bros.*, 817 F.3d at 68.  Because the Complaint fails to allege an underlying breach of duty of prudence, the claim for failure to monitor must also be dismissed.

### D. Motion to Transfer Venue

For reasons already stated, Defendants' motion to dismiss is granted.  Accordingly, Defendants' argument in the alternative, that this action should be transferred to the Southern District of Texas, is not addressed.

## III.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.

The Clerk of Court is directed to close the motion at Dkt. No. 70 and close the case.

SO ORDERED.

Dated: May 24, 2018
       New York, New York

_____
**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**